# Illinois Official Reports

## Supreme Court

***People v. Relerford*, 2017 IL 121094**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. WALTER RELERFORD, Appellee. |
| Docket No. | 121094 |
| Filed | November 30, 3017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Garson S. Fischer, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | Michael J. Pelletier, State Appellate Defender, Patricia Mysza, Deputy Defender, and Jonathan Yeasting, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee. |
| | Steven W. Becker, of Chicago, Eugene Volokh and Gary T. Schwartz, of Los Angeles, California, and Ilya Shapiro, of Washington, D.C., for *amici curiae* Cato Institute *et al.* |

Robert R. Stauffer, Clifford W. Berlow, and Blake P. Sercye, of Jenner & Block LLP, and Rebecca K. Glenberg, both of Chicago, for *amicus curiae* American Civil Liberties Union of Illinois.

Justices                JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1      Following a bench trial in the circuit court of Cook County, defendant, Walter Relerford, was convicted of stalking (720 ILCS 5/12-7.3(a)(1), (a)(2) (West 2012)) and cyberstalking (720 ILCS 5/12-7.5(a)(1), (a)(2) (West 2012)) and was sentenced to serve a prison term of six years. Defendant appealed. The appellate court declared that the provisions of the stalking and cyberstalking statutes under which defendant was convicted are facially unconstitutional as violative of substantive due process and vacated his convictions on that ground. 2016 IL App (1st) 132531. This court granted the State's petition for leave to appeal as a matter of right. Ill. S. Ct. R. 317 (eff. July 1, 2017). We now affirm the judgment of the appellate court, albeit on a different basis than that relied upon by the appellate court.

¶ 2                               I. BACKGROUND

¶ 3      Defendant was charged in a four-count indictment with two counts of stalking (720 ILCS 5/12-7.3(a)(1), (a)(2) (West 2012)) and two counts of cyberstalking (720 ILCS 5/12-7.5(a)(1), (a)(2) (West 2012)). Count I charged defendant with stalking based on allegations that he (1) called Sonya Blakey, (2) sent her e-mails, (3) stood outside of her place of employment, and (4) entered her place of employment and that he knew or should have known that this course of conduct would cause a reasonable person to suffer emotional distress. Count II charged defendant with stalking based on the same conduct specified in count I but alleged that he knew or should have known that his conduct would cause a reasonable person to fear for her safety. Count III charged defendant with cyberstalking based on allegations that he used electronic communication to make Facebook postings in which he expressed his desire to have sexual relations with Sonya Blakey and threatened her coworkers, workplace, and employer and that he knew or should have known that his conduct would cause a reasonable person to fear for her safety. Count IV charged defendant with cyberstalking based on the same conduct specified in count III but alleged that he knew or should have known that his conduct would cause a reasonable person to suffer emotional distress.

¶ 4      At trial, the State presented evidence of the following relevant facts. Sonya Blakey was employed by Clear Channel Media and Entertainment (Clear Channel), where she managed and appeared on-air for a gospel radio station called Inspiration 1390. From May to August 2011, defendant worked as an intern for Inspiration 1390. In September or October 2011, he

applied for a position as board operator at the station. Blakey and Derrick Brown, one of her coworkers, interviewed defendant for the position. After the interview, defendant sent Blakey a follow-up e-mail inquiring as to whether the position had been filled.

¶ 5       Defendant subsequently was informed that he was not being offered the position. In response, defendant called and e-mailed Blakey, as well as several of her colleagues, asking whether he could intern at the station again. Blakey testified that she received about five such e-mails from defendant. None of these e-mails contained any threatening language.

¶ 6       In January 2012, Blakey became aware that defendant was also contacting other Clear Channel employees. At around the same time, Blakey's manager told her to report any e-mails or telephone calls that she received from defendant to the human resources department. According to Blakey, sometime between January and March 2012, Clear Channel took the position that defendant was not welcome at the station and that Clear Channel employees were not to respond to his telephone calls and e-mails.

¶ 7       On one occasion in March 2012, Blakey saw defendant through a window as she was leaving work. Defendant and several companions were standing on the sidewalk outside of the office building in which Clear Channel is located. Defendant saw Blakey and waved at her, but Blakey did not wave back and just continued on her way. Although defendant did not follow her or verbally communicate with her, this encounter made Blakey feel "a little scared" and "a little nervous."

¶ 8       Sometime around late March or early April 2012, Jeffrey Garceau, an executive assistant to Clear Channel's president, directed defendant to stop contacting Clear Channel employees.

¶ 9       On April 4, 2012, Blakey was finishing her broadcast when defendant walked into the studio unannounced. Blakey switched her show to automated programming and asked defendant why he was there. Thereafter, Blakey and one of her colleagues escorted defendant from the building. Although defendant did not threaten her or put up a struggle while being escorted from the premises, the incident caused Blakey to feel "very nervous, very startled, shocked," and "scared."

¶ 10      On April 9, 2012, Blakey received an e-mail from defendant apologizing for the studio visit. In the e-mail, defendant stated, "[m]y intentions were not to startle you or to catch you off guard." Blakey conceded that this e-mail did not contain any statements threatening her safety or the safety of anyone at Clear Channel.

¶ 11      Around the same time that defendant sent the apology e-mail, Blakey learned from a colleague who was a Facebook friend of defendant that he had made several postings on Facebook about her. Defendant did not send the Facebook posts directly to Blakey, and because she was not one of his Facebook friends, she could not view the posts through her own Facebook account. However, Blakey's colleague e-mailed the posts to her. The Facebook posts stated as follows:

> "This is a motherfucking order: If my shit gets shut down by any and everyone who does, dies. You got till Friday at 5:00 p.m. to find some type of job for me with Clear Channel Chicago, maybe a board op or something. If you don't, Saturday is going to be the worst day of your life. That's a motherfucking order, bitch, ass, punk. Send it through 100 shundulah jobo ho 1 [*sic*]."

"The order: If Sonya's vagina is not in my mouth by next Friday, bury the entire Michigan State football team from 1993. That's the order. Send it through. One hundred."

"Just like the folks at Clear Channel think I want to come back to get close to Sonya, I mean, don't get me wrong, who wouldn't want to be close to her? She's wonderful and addictive to be around. The truth of the matter is, since I was 10, I've always wanted to work for WGCI, and that was before it was called Clear Channel. That was back in the 332 South Michigan Avenue days, suite 600. But now, since they are a. [*sic*]"

"How am I gay? I want to fuck Sonya. There's nothing gay about that."

"I still love you, Sonya. Who gives a shit about that other shit? I'm a man before anything. I'm not afraid of anyone. Life is bullshit anyway. I wonder what will happen when I'm dead and gone. I wonder will they just move on to the next person and treat them the same way they are treating me.

I know everything and I'm still not mad. I'm definitely worried about you, though; especially since these Chinese people talking about killing everyone on the 27th and 28th floor of Clear Channel. That's fucked up.

I'll ride for you, Sonya. But these Chinese people don't fuck around. I think I'm going to need to ask Randall for some army weapons to fuck with them. I got your back.

But if the shit gets rough, you better scratch, bite, kick or do something."

¶ 12 As a result of the Facebook posts, the management at Clear Channel advised Blakey to stay home from work until the police located defendant. Blakey took a couple of days off work because defendant's actions made her feel afraid for her own safety. Blakey returned to work after defendant was apprehended on April 12, 2012.

¶ 13 In defense, defendant acknowledged waving to Blakey through the window while he was standing on the sidewalk in March 2012, but he explained that he often patronized the businesses and restaurants on the ground floor of the building in which Clear Channel is located. He also admitted entering the studio on April 4 but stated that he did so only in an effort to inquire about working at Clear Channel. Defendant conceded that he was "maybe over persistent" in sending numerous e-mail inquiries about employment opportunities at Clear Channel, but he denied that he intended any harm in pursuing his long-held career goal of working there. Defendant denied making the Facebook posts and also denied ever being notified that he was not to e-mail, call, or visit employees of Clear Channel.

¶ 14 The trial court found defendant "guilty as charged" and subsequently sentenced him to serve a six-year term for the offense of stalking charged in count I (720 ILCS 5/12-7.3(a)(2) (West 2012)). The court did not impose sentences on the remaining counts, and the record does not reflect the reason for the trial court's failure to do so.

¶ 15 The appellate court vacated all of defendant's convictions based on its determination that the terms of subsection (a) of the stalking and cyberstalking statutes violate due process. 2016 IL App (1st) 132531, ¶¶ 27, 31-33. In the appellate court's view, the United States Supreme Court's decision in *Elonis v. United States*, 575 U.S. ___, 135 S. Ct. 2001 (2015), compelled invalidation of both statutes on due process grounds because the relevant provisions lack a mental state requirement. 2016 IL App (1st) 132531, ¶¶ 21, 26-27, 31-33. In vacating

- 4 -

defendant's unsentenced convictions on counts II, III, and IV, the appellate court concluded that it had jurisdiction to address the validity of those convictions under this court's decision in *People v. Dixon*, 91 Ill. 2d 346 (1982). 2016 IL App (1st) 132531, ¶¶ 29-30.

¶ 16 The State appeals from the judgment of the appellate court as a matter of right. Defendant requests that the appellate court's judgment be affirmed, arguing that subsection (a) of each statute is facially unconstitutional because it is overbroad and violates the first amendment as well as violating substantive due process guarantees. We granted the American Civil Liberties Union of Illinois, the Cato Institute, and the Marion B. Brechner First Amendment Project leave to submit briefs as *amici curiae* in support of defendant. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 17                                                        II. ANALYSIS
¶ 18                                    A. Substantive Due Process Under *Elonis*
¶ 19 On appeal, the State challenges the appellate court's judgment that the stalking and cyberstalking statutes are unconstitutional because they violate substantive due process, which generally requires that criminal conduct be accompanied by a culpable mental state. See *People v. Madrigal*, 241 Ill. 2d 463, 467 (2011). In particular, the State argues that the appellate court erred in holding that the United States Supreme Court's decision in *Elonis*, 575 U.S. ___, 135 S. Ct. 2001, compelled invalidation of subsection (a) of the stalking and cyberstalking statutes on due process grounds because negligence cannot serve as the basis for criminal liability. We agree that the appellate court erred in vacating defendant's convictions based on *Elonis*.

¶ 20 In *Elonis*, the Supreme Court addressed the question of which mental state would be inferred to apply in a federal criminal statute that does not specify a *mens rea* requirement. *Id.* at ___, 135 S. Ct. at 2008-09. The Court recognized that, because criminal offenses generally require proof of a "guilty mind," courts typically interpret a criminal statute to require a criminal *mens rea*, even if the statute fails to include an applicable *scienter* requirement. *Id.* at ___, 135 S. Ct. at 2009. The Supreme Court observed that, although the negligence standard is commonly applied in assessing civil tort liability, federal courts " 'have long been reluctant to *infer* that a negligence standard was intended in criminal statutes.' " (Emphasis added.). *Id.* at ___, 135 S. Ct. at 2011 (quoting *Rogers v. United States*, 422 U.S. 35, 47 (1975) (Marshall, J., concurring, joined by Douglas, J.) (citing *Morissette v. United States*, 342 U.S. 246 (1952))). Because the federal statute at issue in *Elonis* prohibited the transmission of threats in interstate commerce but did not specify a required mental state, the Court inferred that the government must prove the defendant either intended to issue threats or knew that his communications would be viewed as threats. *Id.* at ___, 135 S. Ct. at 2012. However, the Court also acknowledged that, if Congress had intended to criminalize reckless or negligent conduct, it could have done so specifically. *Id.* at ___, 135 S. Ct. at 2010 (citing *Liparota v. United States*, 471 U.S. 419, 427 (1985)).

¶ 21 We agree with the State that the appellate court's reasoning is flawed. *Elonis* was not a due process case, and the Supreme Court did not engage in any due process analysis. Rather, *Elonis* merely decided a question of statutory interpretation and determined that, where the subject criminal statute was silent as to *mens rea*, a mental state of intent or knowledge would suffice. *Id.* at ___, 135 S. Ct. at 2012. On several occasions, this court has similarly inferred a requisite

mental state where the statute is silent as to *mens rea*. See *People v. Anderson*, 148 Ill. 2d 15, 23-24 (1992); *People v. Tolliver*, 147 Ill. 2d 397, 400-03 (1992); *People v. Gean*, 143 Ill. 2d 281, 287-89 (1991); *People v. Sevilla*, 132 Ill. 2d 113, 120, 123 (1989). But these cases, like *Elonis*, have no bearing on the case before us because, as set forth below, the statutory provisions at issue here are not silent as to mental state.

¶ 22 Further, the appellate court's conclusion that due process does not permit criminal liability based on negligent conduct is unfounded. Indeed, *Elonis* acknowledged that criminal negligence has been recognized as a valid basis for imposing criminal liability. See *Elonis*, 525 U.S. at ___, 135 S. Ct. at 2011 (citing Model Penal Code § 2.02(2)(d) (Am. Law Inst. 1985), and 1 Wayne R. LaFave & David C. Baum, Substantive Criminal Law § 5.4, at 372-73 (2d ed. 2003)). Also, the Criminal Code of 2012 includes both recklessness and negligence as permissible mental states, and absolute liability is permitted in certain limited circumstances. See 720 ILCS 5/4-6, 4-7, 4-9 (West 2012). Contrary to the views expressed by the appellate court, substantive due process does not categorically rule out negligence as a permissible mental state for imposition of criminal liability, and *Elonis* does not suggest such a categorical rule. Therefore, we reject the appellate court's reasoning and its determination that *Elonis* mandates invalidation of the statutory provisions at issue here.

¶ 23 B. First Amendment

¶ 24 Defendant does not seek affirmance under *Elonis* but argues that the appellate court's judgment should be sustained for other reasons. Defendant's primary argument to this court is that the stalking and cyberstalking provisions under which he was convicted are facially unconstitutional because they violate the right to free speech as guaranteed under the United States and Illinois Constitutions. U.S. Const., amend. I; Ill. Const. 1970, art. I, § 4. He also argues that the relevant provisions violate substantive due process guarantees because they improperly criminalize innocent conduct. The State opposes both contentions.

¶ 25 We first consider defendant's argument that the relevant statutory provisions are facially unconstitutional because they violate the right to free speech under the first amendment. We begin by examining the history and terms of the stalking statute as they relate to defendant's conviction under count I.

¶ 26 Illinois's first stalking statute, enacted in 1992, defined the offense as requiring an intentional threat of a violent crime plus multiple acts of following or surveillance in furtherance of the threat. See 720 ILCS 5/12-7.3(a) (West 1992). The statute was subsequently modified to require that the defendant's actions be undertaken "knowingly and without lawful justification." 720 ILCS 5/12-7.3(a) (West 1994). This court held that the threat-focused version of subsection (a) was not unconstitutionally overbroad because the speech prohibited by the statute was an integral part of unlawful conduct. See *People v. Bailey*, 167 Ill. 2d 210, 227 (1995). This conclusion was premised on the fact that the statute encompassed only activities performed without lawful authority and required that the defendant actually threaten the victim and take action in furtherance of the threat. *Id.* at 227-28.

¶ 27 With the adoption of amendments that became effective in 2010, the legislature greatly expanded the definition of the offense of stalking. See Pub. Act 96-686, § 5 (eff. Jan. 1, 2010). The previous threat-focused definition of stalking was retained and renumbered as subsection (a-3). 720 ILCS 5/12-7.3(a-3) (West 2012). However, the legislature also crafted new statutory

language to include additional conduct in the definition of the offense. The new language significantly broadened the types of conduct proscribed under the statute and eliminated the requirement of a threat from subsection (a).

¶ 28    The current version of subsection (a) of the stalking statute provides as follows:

"A person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to:

(1) fear for his or her safety or the safety of a third person; or

(2) suffer other emotional distress." 720 ILCS 5/12-7.3(a)(1), (a)(2) (West 2012).

The phrase "course of conduct" is defined in subsection (c) as:

"2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. A course of conduct may include contact via electronic communications." 720 ILCS 5/12-7.3(c)(1) (West 2012).

In addition, subsection (c) defines "emotional distress" as "significant mental suffering, anxiety or alarm." 720 ILCS 5/12-7.3(c)(3) (West 2012). The phrase "reasonable person" is defined as "a person in the victim's situation." 720 ILCS 5/12-7.3(c)(8) (West 2012).[1] Subsection (c) defines "non-consensual contact" as "any contact with the victim that is initiated or continued without the victim's consent." 720 ILCS 5/12-7.3(c)(6) (West 2012). Under that provision, "non-consensual contact" includes "being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim." *Id.*

¶ 29    Under the terms of the amended statute, two or more nonconsensual communications to or about a person that the defendant knows or should know would cause a reasonable person to suffer emotional distress constitute a course of conduct sufficient to establish the offense of stalking. See 720 ILCS 5/12-7.3(a), (c) (West 2012); see also *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 41 (holding that only "non-consensual" communications fall within the prohibition of subsection (a)). Defendant contends that the new provisions, criminalizing communications to or about a person that negligently would cause a reasonable person to suffer emotional distress, violate the first amendment. U.S. Const., amend. I.[2]

¶ 30    In general, statutes are presumed constitutional, and the party challenging the constitutionality of a statute carries the burden of proving that the statute is unconstitutional.

---

[1]These provisions of the stalking statute are substantially similar to corresponding provisions in the cyberstalking statute. However, the definition of cyberstalking in subsection (a) of that statute additionally requires that the defendant "us[e] electronic communication" in committing the offense. See 720 ILCS 5/12-7.5(a), (c) (West 2012).

[2]We note that, although defendant did not raise his first amendment facial challenge in the circuit court, the argument was raised on appeal. See *People v. Thompson*, 2015 IL 118151, ¶ 32 (recognizing that a facial challenge to a criminal statute, asserting that it is void *ab initio*, may be raised at any time). The State does not dispute that the argument is properly before this court.

*People v. Hollins*, 2012 IL 112754, ¶ 13. The primary objective in construing a statute is to ascertain and give effect to the legislature's intent in enacting the statute. *People v. Gutman*, 2011 IL 110338, ¶ 12. This court has a duty to construe the statute in a manner that upholds the statute's validity and constitutionality if reasonably possible. *Hollins*, 2012 IL 112754, ¶ 13. The determination of whether a statute is constitutional is a question of law to be reviewed *de novo*. *Id.*

¶ 31    The first amendment, which applies to the states through the fourteenth amendment, precludes the enactment of laws "abridging the freedom of speech." U.S. Const., amends. I, XIV. Under this amendment, a government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (Internal quotation marks omitted.) *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002). Therefore, "[t]he Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).

¶ 32    Content-based laws, which target speech based on its communicative content, are presumed to be invalid. *United States v. Stevens*, 559 U.S. 460, 468 (2010); see also *People v. Alexander*, 204 Ill. 2d 472, 476 (2003). In addition to restrictions that are facially content based, the United States Supreme Court has "recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech" because they "cannot be ' "justified without reference to the content of the regulated speech." ' " *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2227 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

¶ 33    However, the United States Supreme Court has recognized that certain "historic and traditional" categories of expression do not fall within the protections of the first amendment, and content-based restrictions with regard to those recognized categories of speech have been upheld. (Internal quotation marks omitted.) *United States v. Alvarez*, 567 U.S. 709, 717 (2012); *Alexander*, 204 Ill. 2d at 476-77. Those accepted categories of unprotected speech include true threats (see *Watts v. United States*, 394 U.S. 705 (1969) (*per curiam*)) and speech integral to criminal conduct (see *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)).

¶ 34    Of relevance here, the proscription against "communicat[ions] to or about" a person that negligently would cause a reasonable person to suffer emotional distress criminalizes certain types of speech based on the impact that the communication has on the recipient. Under the relevant statutory language, communications that are pleasing to the recipient due to their nature or substance are not prohibited, but communications that the speaker "knows or should know" are distressing due to their nature or substance are prohibited. Therefore, it is clear that the challenged statutory provision must be considered a content-based restriction because it cannot be justified without reference to the content of the prohibited communications. See *Reed*, 576 U.S. at ___, 135 S. Ct. at 2227; see also *Matal v. Tam*, 582 U.S. ___, ___, 137 S. Ct. 1744, 1764-65 (2017) (plurality opinion) (holding that the "disparagement clause," which prohibits federal registration of a trademark based on its offensive content, violates the first amendment). The State essentially concedes this point by failing to present any argument to the contrary and by contending that the terms of subsection (a) survive the strict scrutiny standard applicable to content-based restrictions.

¶ 35 The State argues, however, that the communications prohibited in subsection (a) do not unconstitutionally encroach on the right to speech because they are categorically unprotected by the first amendment. In particular, the State claims that "communicat[ions] to or about" a person are exempt from first amendment protection because they fall within either the exception for true threats or the exception applicable to speech that is integral to criminal conduct. We disagree.

¶ 36                                     1. True Threats

¶ 37 With regard to the exception for true threats, the Supreme Court has held that a communication qualifies as a true threat if it contains a "serious expression of an intent to commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343, 359 (2003); see also *Watts*, 394 U.S. at 708 (holding that political hyperbole does not constitute a true threat and, therefore, is protected by the first amendment).

¶ 38 The State offers no cogent argument as to how a communication to or about a person that negligently would cause a reasonable person to suffer emotional distress fits into the established jurisprudence on true threats. The State does not explain how such a communication, without more, constitutes a "serious expression of an intent to commit an act of unlawful violence." *Black*, 538 U.S. at 359. Moreover, it is unclear whether the true threat exemption from the first amendment would apply to a statement made with innocent intent but which negligently conveys a message that a reasonable person would perceive to be threatening. Compare *United States v. Cassel*, 408 F.3d 622, 632-33 (9th Cir. 2009) (interpreting the Supreme Court's decision in *Black* as indicating that speech is unprotected under the first amendment only if the speaker subjectively intended the speech as a threat), with *State v. Johnston*, 127 P.3d 707, 710 (Wash. 2006) (adopting an objective standard for statements that may be understood to convey a threat, even if the speaker did not so intend). The State does not attempt to reconcile this conflicting precedent.

¶ 39 However, we need not resolve that question here to dispose of the State's argument. Subsection (a) of the stalking statute specifically includes the making of threats as an independent basis of a course of conduct. The prohibition against distressing communications to or about a person stands separate and apart from the proscription against threats. Therefore, even assuming that statements which negligently convey a threat are not protected, a course of conduct based on such statements could be prosecuted under the threat portion of subsection (a). If distressing communications to or about a person are construed to refer to "true threats," as the State's argument suggests, then the language proscribing threats would be superfluous. Such a construction must be rejected because this court presumes that each part of a statute has meaning, and we will not construe a statute to render any part of it superfluous or redundant. *People v. Baskerville*, 2012 IL 111056, ¶ 25. Consequently, even if the negligent communication of a threatening message is unprotected, the State's argument fails.

¶ 40                     2. Speech Integrally Related to Criminal Conduct

¶ 41 The State next contends that first amendment protections are not implicated because subsection (a) of the stalking statute is targeted at regulating conduct and not speech. In the State's view, because subsection (a) criminalizes only a "course of conduct," the prohibited actions do not fall within the protection of the first amendment. In support, the State relies on

the Supreme Court's decision in *United States v. O'Brien*, which held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

¶ 42　　The State's reliance on *O'Brien* is misplaced because nothing in subsection (a) requires that speech and nonspeech elements be combined. Although the plain language of subsection (a) prohibits a "course of conduct," each of the actions identified in that subsection stands alone as actions that can form the basis of the course of conduct. Among the particularly specified actions are "communicat[ions] to or about" a person that the defendant knows or should know would cause a reasonable person to suffer emotional distress. The communications need not be accompanied by any other action to form the predicate for a prohibited course of conduct. As subsection (a) is written, two or more such communications are sufficient to form a course of conduct and warrant prosecution under subsection (a).

¶ 43　　The State maintains, however, that the phrase "communicates to or about" does not implicate first amendment rights because it relates to speech that is integral to criminal conduct. The State's contention is wrong. The rule cited by the State applies when the speech is "an integral part of conduct in violation of a valid criminal statute." *Giboney*, 336 U.S. at 498.

¶ 44　　Thus, speech is "fully outside" the protection of the first amendment when it is a mechanism or instrumentality in the commission of a separate unlawful act. *Stevens*, 559 U.S. at 471. According to the Supreme Court, this rule applies only where there is a " 'proximate link' " between the speech at issue and the criminal conduct. *Id.* (quoting *Ashcroft v. Free Speech Coalition*, 535 U.S. at 249-50). Consequently, the State's reliance on *New York v. Ferber*, 458 U.S. 747 (1982), which upheld a ban on child pornography, is misplaced.

¶ 45　　Here, subsection (a) does not require that the prohibited communications be in furtherance of an unlawful purpose. As such, there is no "proximate link" between the restricted communications and some other criminal act. In light of the fact that a course of conduct can be premised exclusively on two communications to or about a person, this aspect of subsection (a) is a direct limitation on speech that does not require any relationship—integral or otherwise—to unlawful conduct. Under subsection (a), the speech *is* the criminal act.

¶ 46　　The State's argument is not bolstered by its reliance on *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014), *United States v. Sayer*, 748 F.3d 425 (1st Cir. 2014), and *United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2012). Each of those cases upheld the constitutionality of the federal stalking statute, which explicitly requires that the defendant have the intent to kill, injure, harass, or intimidate the victim. See 18 U.S.C. § 2261A (2012). Because the federal stalking statute requires intent to commit an unlawful act and does not impose criminal liability for negligent conduct, the decisions in *Osinger*, *Sayer*, and *Petrovic* provide no guidance in this case.

¶ 47　　Also, we note that courts in other jurisdictions have rejected similar arguments as a justification for upholding statutes that are comparable to subsection (a). See *State v. Bishop*, 787 S.E.2d 814, 817-18 (N.C. 2016); *People v. Marquan M.*, 19 N.E.3d 480 (N.Y. 2014); *State v. Machholz*, 574 N.W.2d 415 (Minn. 1998).

¶ 48　　Because the speech restrictions imposed by subsection (a) do not fit within any of the "historic and traditional" categories of unprotected speech, we review defendant's argument

under the overbreadth doctrine. See generally *Stevens*, 559 U.S. at 471-72.

¶ 49                                         3. Overbreadth

¶ 50         A statute is overbroad on its face if it prohibits constitutionally protected activity as well as activity that may be prohibited without offending constitutional rights. *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). Consequently, the overbreadth doctrine permits a party to challenge a statute as a facial violation of the first amendment, even if that party's conduct would not fall within the amendment's protection. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *People v. Minnis*, 2016 IL 119563, ¶ 14. The justification for allowing an overbreadth challenge is the important goal of avoiding the potential chilling effect that overbroad statutes have on the exercise of protected speech. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003); *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).

¶ 51         A statute "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " *Stevens*, 559 U.S. at 473 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Given its limited application, the Supreme Court has observed that the overbreadth doctrine should be applied "only as a last resort" and only if the degree of overbreadth is substantial and the statute is not subject to a limiting construction. *Broadrick*, 413 U.S. at 613.

¶ 52         The initial step in overbreadth analysis is to examine the challenged legislation because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). As set forth above, subsection (a) of the stalking statute defines the offense of stalking to include a course of conduct evidenced by two or more nonconsensual communications to or about a person that the defendant knows or should know would cause a reasonable person to suffer emotional distress. 720 ILCS 5/12-7.3(a)(2), (c) (West 2012); *Douglas*, 2014 IL App (5th) 120455, ¶ 41. That provision, therefore, imposes a content-based restriction on speech and criminalizes communications to or about a person that negligently would cause a reasonable person to suffer emotional distress. As amended in 2010, subsection (a) embraces a vast array of circumstances that limit speech far beyond the generally understood meaning of stalking. Indeed, the amended provision criminalizes any number of commonplace situations in which an individual engages in expressive activity that he or she should know will cause another person to suffer emotional distress. The broad sweep of subsection (a) reaches a host of social interactions that a person would find distressing but are clearly understood to fall within the protections of the first amendment.

¶ 53         For example, subsection (a) prohibits a person from attending town meetings at which he or she repeatedly complains about pollution caused by a local business owner and advocates for a boycott of the business. Such a person could be prosecuted under subsection (a) if he or she persists in complaining after being told to stop by the owner of the business and the person knows or should know that the complaints will cause the business owner to suffer emotional distress due to the economic impact of a possible boycott.

¶ 54         The communications described above would be criminal even though they constitute speech in a public forum about a matter of public concern—a quintessential example of the type of speech that is protected by the first amendment. See *Snyder v. Phelps*, 562 U.S. 443,

451-52 (2011) (recognizing that speech on issues of public concern is "at the heart" of the first amendment's protection (internal quotation marks omitted)); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (noting that the first amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"); *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) (holding that "speech concerning public affairs is more than self-expression; it is the essence of self-government"). As the Supreme Court has observed, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (Internal quotation marks omitted.) *Connick v. Myers*, 461 U.S. 138, 145 (1983).

¶ 55    Indeed, even core political speech could be prosecuted under subsection (a) if the speaker knows or should know that the substance of his or her comments would cause a reasonable person to suffer emotional distress. This result would contravene the very purpose of the first amendment, which " 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *Sullivan*, 376 U.S. at 269 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)); see also *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 641 (1994) (recognizing that our political system and cultural life are premised on the notion that "[a]t the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence").

¶ 56    The Supreme Court has acknowledged that "*[m]ost* of what we say to one another lacks 'religious, political, scientific, educational, journalistic, historical, or artistic value' (let alone serious value), but it is still sheltered from Government regulation." (Emphasis in original.) *Stevens*, 559 U.S. at 479. Given the wide-ranging scope of the first amendment, its protection presumptively extends to many forms of speech that would fall within the broad spectrum of speech restricted by subsection (a).

¶ 57    We reject the State's assertion, made at oral argument, that the phrase "directed at" sufficiently narrows the scope of subsection (a) to insulate it from a first amendment challenge. This assertion suggests that the "directed at" language brings the prohibition against communications to or about a person within the category of speech that is unprotected under *Rowan v. United States Post Office Department*, 397 U.S. 728 (1970) (holding that nonconsensual one-to-one communications that impinge on the privacy rights of the recipient are not protected under the first amendment). However, the plain meaning of the phrase "directed at" does not limit its application to one-to-one communications affecting the right to privacy or prevent prosecution for communication in a public forum where the victim is a known or intended recipient of the message.

¶ 58    The example of the person voicing complaints during a town meeting about pollution caused by a local business illustrates the point. If the business owner is present at the town meetings, the complaints would be "directed at" him or her and could be the basis of a prosecution under subsection (a) even though the complaints would not fall into *Rowan*'s one-to-one exception from the first amendment.

¶ 59    Moreover, it is unclear from the State's suggestion whether the phrase "directed at" includes communications about the victim that are intended to be seen or heard by other people but *not* the victim. If so, such a situation is greatly attenuated from the circumstances contemplated by *Rowan* and would extend the scope of subsection (a) far beyond the

reasonable limits of the Supreme Court's holding in that case. Nothing in the State's argument before this court clarifies how inclusion of the phrase "directed at" prevents the application of subsection (a) to circumstances that are not covered under *Rowan*.

¶ 60    A limiting construction should be imposed on a statute only where the statute is " ' "readily susceptible" to such a construction.' " *Stevens*, 559 U.S. at 481 (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884 (1997)). Based on the above, we do not believe the "directed at" language can be interpreted to sufficiently narrow the scope of subsection (a) to avoid the infringement of first amendment rights. Accordingly, we find that the statute is not "readily susceptible" to the State's suggested limiting construction. See *id.*

¶ 61    We also reject the State's argument that the exemption in subsection (d)(2) of the stalking statute avoids any constitutional defect in the terms of subsection (a). The exemption on which the State relies states that "[t]his [s]ection does not apply to an exercise of the right to free speech or assembly that is otherwise lawful." 720 ILCS 5/12-7.3(d)(2) (West 2012). Yet, as was true with the earlier threat-focused version of subsection (a), the exemption contains no language that would actually prevent the prosecution of charges based on protected speech. Rather, the exemption is correctly viewed to function as an affirmative defense that must be raised by a defendant at trial after a prosecution has been initiated. As such, the exemption cannot eliminate the chilling effect on protected speech and resulting self-censorship.

¶ 62    Contrary to the State's assertion, the exemption does not prevent unwarranted prosecutions under a case-by-case application of the "communicates to or about" language. Nothing in the language of subsection (a) explicitly differentiates between distressing communications that are subject to prosecution and those that are not—and the State has not offered any guidance as to how Illinois citizens should tease out that difference. A case-by-case discretionary decision by law enforcement officers and prosecutors does not solve the problem of the chilling effect on innocent speakers who fear prosecution based on negligently made distressing communications to or about a person. We conclude that subsection (d)(2) is insufficient to remediate the extreme overbreadth of subsection (a) and cannot by itself make the terms of that provision constitutional. See generally *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 670-71 (2004); *Ashcroft v. Free Speech Coalition*, 535 U.S. at 255; see also *United States v. Stevens*, 533 F.3d 218, 231 n.13 (3rd Cir. 2008) (*en banc*) (observing that, where a statutory exemption functions as an affirmative defense, it "poses an even greater threat to chill constitutional speech").

¶ 63    Given the wide range of constitutionally protected activity covered by subsection (a), we conclude that a substantial number of its applications are unconstitutional when judged in relation to its legitimate sweep. See *Stevens*, 559 U.S. at 473. Accordingly, the degree of overbreadth is substantial, rendering subsection (a) overbroad on its face. We hold that the portion of subsection (a) of the stalking statute that makes it criminal to negligently "communicate[ ] to or about" a person, where the speaker knows or should know the communication would cause a reasonable person to suffer emotional distress, is facially unconstitutional. Additionally, because subsection (a) of the cyberstalking statute imposes criminal liability based on similar language, it is unconstitutionally overbroad as well. See 720 ILCS 5/12-7.5(a) (West 2012).

C. Severability and Validity of
Defendant's Convictions on Other Grounds

¶ 65    Public Act 96-686, which added the language "communicates to or about" a person to the definitions of stalking and cyberstalking, specifically states that its provisions are severable under section 1.31 of the Statute on Statutes (5 ILCS 70/1.31 (West 2012)). See Pub. Act 96-686, § 97 (eff. Jan. 1, 2010). Therefore, the phrase "communicates to or about" must be stricken from subsection (a) in each statute. Accordingly, we address whether defendant's convictions can be sustained based on other conduct prohibited by the stalking and cyberstalking statutes.

¶ 66    Under counts I and II, defendant was charged with calling and e-mailing Blakey. However, because there is no evidence that any of the calls or e-mails were threatening, they cannot be considered as part of a course of conduct under subsection (a). Consequently, we consider whether the convictions under counts I and II may be upheld based on any other conduct occurring after Garceau issued the "no-contact" directive in late March or early April 2012.[3]

¶ 67    Regarding defendant's wave to Blakey through a window from outside the Clear Channel office building, the record does not establish that this action constitutes nonconsensual contact under subsection (c)(6). Although Blakey testified that the incident occurred sometime in March 2012, she did not identify the exact date. In addition, although Blakey indicated that the incident occurred at a time when defendant was not welcome at the radio station, her testimony did not affirmatively establish that it occurred after the "no-contact" directive by Garceau. Therefore, this incident cannot be considered as part of a course of conduct for purposes of counts I and II.

¶ 68    What remains is the uninvited studio visit on April 4, which did occur after Garceau directed defendant to cease all contact with Clear Channel employees. Although this incident would constitute nonconsensual contact under subsection (c)(6), it amounts to a single instance of such contact and is insufficient to establish a course of conduct requiring two or more acts. See 720 ILCS 5/12-7.3(c)(1), (c)(6) (West 2012).

¶ 69    Counts III and IV were predicated exclusively on communications about Blakey in the Facebook posts. None of those posts included any language that can be construed as a threat specifically directed at her, and counts III and IV alleged only that defendant had threatened Blakey's coworkers, workplace, and employer. As a whole, the Facebook posts are vulgar and intrusive, but they cannot be characterized as conveying a threat against Blakey. Moreover, even if the first Facebook post could be seen as threatening to all Clear Channel employees, including Blakey, it amounts to only one such communication. A single Facebook post does not establish a course of conduct under subsection (a) of the cyberstalking statute. Accordingly, all four of defendant's convictions must be vacated.

¶ 70                              D. Invalidation of the Unsentenced Convictions

¶ 71    As a final matter, we address the appellate court's decision to address the validity of defendant's unsentenced convictions under counts II, III, and IV. The appellate court

---

[3]Although the "no-contact" directive was not issued by Blakey personally, defendant does not argue that Garceau lacked authority to issue the directive on her behalf as one of Clear Channel's employees.

acknowledged that its jurisdiction extends only to final judgments and that there is no final judgment in a criminal case unless sentence has been imposed. 2016 IL App (1st) 132531, ¶ 29 (citing Ill. Const. 1970, art. VI, § 6, and *People v. Flores*, 128 Ill. 2d 66, 95 (1989)). The court concluded, however, that it had jurisdiction to address the unsentenced convictions based on this court's decision in *Dixon*, 91 Ill. 2d 346. We find the appellate court's conclusion to be unwarranted under the circumstances of this case.

¶ 72    In *Dixon*, the circuit court incorrectly determined that two of the defendant's convictions merged into two other, more serious convictions. *Id.* at 349. As a consequence, the circuit court did not impose sentence on the lesser offenses. *Id.* The defendant appealed only the two sentenced convictions. *Id.* at 353. In response, the State requested that the appellate court remand the cause for imposition of sentences on the lesser offenses. *Id.* at 349. The appellate court reversed one of the sentenced convictions and affirmed the other but refused the State's request to remand the cause for sentencing on the convictions for the lesser offenses. *Id.*

¶ 73    The State appealed, arguing that the appellate court's refusal to remand was erroneous. *Id.* This court agreed, finding that the situation presented in that case was "an anomalous one." *Id.* at 353. This court held that, although the unsentenced convictions were nonfinal orders, the appellate court had jurisdiction to order a remand for imposition of sentence because the defendant had appealed the final judgments entered on the sentenced convictions and because the convictions on the lesser offenses were "intimately related to and 'dependent upon' " the sentenced convictions appealed by the defendant. *Id.* at 353-54 (citing Ill. S. Ct. R. 615(b)(2)).

¶ 74    We find that the appellate court's reliance on *Dixon* in this case is misplaced for two reasons. First, *Dixon* is distinguishable on its facts. As this court stated, the situation underlying that decision was "anomalous" because the circuit court determined, albeit incorrectly, that sentences could not be imposed on the lesser offenses because they merged into the other offenses. In our view, the decision in *Dixon* must be understood to be limited to the type of factual situation presented in that case, which does not exist here. We have no such explanation for the circuit court's failure to impose sentences on counts II, III, and IV. The record is simply silent as to the reason for the court's action—or inaction—in this case.

¶ 75    Second, we believe that *Dixon* must be given a narrower interpretation than the one assumed by the appellate court. A close reading of *Dixon* makes clear that, to the extent the appellate court had any jurisdiction to address the nonfinal convictions, that jurisdiction was limited to ordering a remand for imposition of sentences on the lesser convictions. In this case, the appellate court's conclusion that it was authorized to consider the merits of defendant's unsentenced convictions under counts II, III, and IV reads *Dixon* too broadly and extends that decision beyond its reasonable limits. We hold, therefore, that the appellate court lacked jurisdiction to decide the validity of defendant's unsentenced convictions.

¶ 76    This court, however, has general administrative and supervisory authority over all courts under section 16 of the judicial article of the Illinois Constitution. Ill. Const. 1970, art. VI, § 16. In the exercise of this court's supervisory authority, we opt to exercise jurisdiction over the unsentenced convictions in counts II, III, and IV here. See *e.g.*, *McDunn v. Williams*, 156 Ill. 2d 288, 299-304 (1993). Because all of defendant's convictions were based on provisions that are unconstitutionally overbroad and violative of the first amendment and because those convictions cannot be sustained on other grounds, we vacate defendant's convictions under all

four counts of the indictment.

¶ 77                                    III. CONCLUSION

¶ 78        In sum, the terms of subsection (a) of the stalking and cyberstalking statutes violate the first amendment because they are overbroad in that they impermissibly infringe on the right to free speech. Accordingly, the phrase "communicates to or about" is stricken from those provisions. Because defendant's convictions under those provisions cannot be sustained based on other conduct, his convictions must be vacated, and we affirm the judgment of the appellate court. In light of our resolution of the first amendment issue, we need not address the remaining arguments of the parties.

¶ 79        Appellate court judgment affirmed.