2020 IL App (2d) 180197-U
No. 2-18-0197
Order filed July 21, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CM-869 |
| CHARLES E. PARNELL, | ) ) | Honorable Robert A. Wilbrandt Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to convict defendant of cruel treatment of a horse by starvation.  There were conflicting accounts at trial as to how defendant's horses become emaciated, and it was the province of the jury to assess the credibility of the witnesses and conclude that defendant was responsible for the neglect.

¶ 2    Defendant, Charles E. Parnell, appeals from the judgment of the circuit court of McHenry County finding him guilty of five counts of cruel treatment of a horse by starvation (510 ILCS 70/3.01 (West 2014)).  Although defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt, we disagree and affirm.

¶ 3                                I. BACKGROUND

¶ 4    Defendant was charged by information with five counts of cruel treatment of a horse by starvation (510 ILCS 70/3.01 (West 2014)), five counts of neglect of an owner's duties by failing to provide sufficient food to a horse (510 ILCS 70/3(a)(1) (West 2014)), five counts of neglect of an owner's duties by failing to provide veterinary care (510 ILCS 70/3(a)(3) (West 2014)), and one count of failure to dispose of a dead horse (225 ILCS 610/17(a) (West 2014)).  Before trial, the trial court dismissed the charge pertaining to the failure to dispose of a dead horse.

¶ 5    The following facts were presented at defendant's jury trial.  On the afternoon of December 21, 2014, John Huff, a certified humane investigator with the Hooved Animal Humane Society (HAHS), was called to retrieve four horses from a property on Hartman Road near Marengo.  Huff arranged to meet at the Hartman Road property with two animal control officers and a McHenry County deputy sheriff.  Huff arrived between 2:30 and 3 p.m.

¶ 6    Huff observed a barn with a horse in an adjacent paddock.  There was no food or water in the paddock.  Huff could see the ribs and spine of the horse, and when he touched it he could feel between the ribs.

¶ 7    Inside the barn, Huff saw a stall with a dead mare.  The body was lying in feces and was partially covered with a blanket or two.  It was severely undernourished.  Its hind legs had marks where the hair had been rubbed off, as though it had been thrashing before it died.  In that stall there were tipped over water buckets and no food.

¶ 8    There were also three other stalls; one contained a black mare, one a blind paint-colored horse, and one other paint-colored horse.  All three horses were underweight.  Huff could see their ribs, feel their spines, and see bony points on their butts.  There was no bedding, water, or food in any of the three stalls.  None of the horses could exit the stalls or had access to food.  He observed where the horses had chewed the wood on the sides of the stalls.

¶ 9        Huff found unopened bags of cracked corn in a room of the barn. Huff had never fed horses cracked corn. According to Huff, horses are typically fed grain that has vitamins and minerals. They also need hay and water. Huff did not know who had put the bags of corn in the barn. Huff admitted that he never went into the upper level of the barn and did not know if there was any hay there. Huff took all four living horses to HAHS where they were rehabilitated.

¶ 10      On December 21, 2014, Nicolet Sink, an animal control officer, received a complaint and went to the Hartman Road property. Sink and another animal control officer knocked on the door of a house and received permission to enter a barn. Inside the barn there were three horses in stalls and one horse outside in a corral. There was no food or water in the barn. There was a room that had grain in it, but the horses had no access to the grain. The wood around the stalls had been chewed. After two sheriff's deputies arrived, Sink contacted HAHS. Sink and others loaded the dead horse into a trailer, and it was transported to Urbana.

¶ 11      Jenna Dickson, a certified humane investigator with HAHS, met with Huff at the HAHS facility and then went with him to the Hartman Road property. Huff had already transported two of the surviving horses to the HAHS facility. Dickson observed the body of the mare and estimated that she had been dead for several days. Dickson described the barn as dirty, with mud and feces everywhere. There was no fresh bedding in any of the stalls. Nor was there any food in the stalls of the two surviving horses left in the barn. Dickson never saw any food in the barn. The black mare that was still alive had an open wound on her left shoulder that smelled bad and oozed pus.

¶ 12      Steven Kloeckner, a farm manager at County Line Farm, testified that, from October of 2014 to August of 2015, he dated the daughter of Nancy Wolfe, who owned the Hartman Road property. During that time, Kloeckner would be at the Hartman Road property five days a week. Wolfe would rent the barn farthest to the west for horses. Kloeckner never went in that barn. On

December 21, 2014, defendant was using that barn to board his horses. Kloeckner estimated that defendant had had horses there for about two months. According to Kloeckner, defendant had asked him to care for defendant's horses, but Kloeckner declined. Kloeckner never fed or cared for defendant's horses while they were on Wolfe's property. If Wolfe asked, Kloeckner would feed and water her horses. According to Kloeckner, horses should be fed hay and grain at least two times per day. Their water should be changed twice a day. Kloeckner saw defendant on the property about five times during the two months that he had horses there. Kloeckner admitted on cross-examination, however, that he was not there every day. Kloeckner knew of no arrangement defendant had made to have his horses fed. Kloeckner never saw anyone other than defendant tend to his horses.

¶ 13    Dr. Kati Lukas testified as an expert in equine veterinary medicine. On December 21, 2014, she was on call for HAHS. Dr. Lukas examined the four horses at HAHS. All were malnourished and their teeth had not been filed for some time. A horse with sharp teeth cannot obtain all of the nutrients from food. Dr. Lukas performed blood and fecal examinations, which showed the absence of any disease that might have caused the horses' condition. She opined that the horses' condition was attributable to a lack of food and nutrients. The horses' feet had also not been properly tended for a long time. The wound on the black mare was matted with feces, and there was pus and blood under the feces.

¶ 14    According to Dr. Lukas, horses typically require feed two to three times a day plus pasture. A 1,000-pound horse needs 15 to 20 pounds of hay per day. She opined that the horse with the worst weight loss could have taken over six months to lose that weight. The other three horses would have taken a couple of months to reach their condition. It would have taken their teeth a year or more, and their hooves at least five to six months, to reach their condition. She explained

that "cribbing" is when a horse chews the wood in its stall. Cribbing is a behavioral disorder resulting from either boredom or lack of food.

¶ 15    Detective Maldonado of the McHenry County Sheriff's Office was assigned to investigate the treatment of the horses. In February of 2015, defendant contacted Detective Maldonado. Defendant told Detective Maldonado that he understood that Detective Maldonado was investigating him and that he wanted to talk. At around 2:30 p.m. on February 23, 2015, they met at the sheriff's office.

¶ 16    Detective Maldonado video recorded the interview. During the interview, defendant explained that, beginning in the summer of 2014, he had kept the horses at a property on Highway 20 in McHenry County and that they were all healthy. However, defendant became ill in October of 2014 and took the horses to a friend, George Brown, in Peoria. Brown was to care for the horses while defendant went to Iowa City, Iowa, for medical care. Defendant told Detective Maldonado that he took 2 tons of grain and about 170 bales of hay to Brown's to feed the horses. After the horses had been at Brown's for a month, Brown called defendant and said that one of the horses had died. Defendant immediately drove to Peoria where he discovered that all of his horses were starving and in poor health. According to defendant, he immediately loaded the horses on his trailer and took them to Nancy Wolfe's property on Hartman Road. Defendant told Detective Maldonado that the horses were skinny when he brought them to Wolfe's property. Defendant also said that the mare died on December 20 and that he had arranged to have her picked up. Defendant became ill with pneumonia and was at the hospital in Iowa City on December 21, 2014. According to defendant, he was at Wolfe's feeding his horses every afternoon until he became sick. He paid Kloeckner to feed the horses every morning. Defendant also told Detective Maldonado that he had photos of the horses showing that they were in good health, receipts for the

feed that he had taken to Peoria, and documentation of his hospital visits.  He offered to provide those.

¶ 17    Detective Maldonado testified that defendant never provided him any receipts for food, photos of the horses, or documentation for his hospital visits.  He admitted, however, that he never subpoenaed any records for feed purchases or photos of the horses.  When he contacted the hospital in Iowa City, they refused to provide defendant's medical records.  According to Detective Maldonado, he tried several times unsuccessfully to contact Brown in Peoria.

¶ 18    Nancy Wolfe testified for defendant.  She had known defendant for about 13 years.  She had bought several horses from him over the years.  One horse was very thin, and she and defendant nursed it back to health.  Her daughter won several competitions with that horse.

¶ 19    According to Wolfe, in late November of 2014, defendant called and begged her to allow him to board his horses at her Hartman Road property.  She reluctantly agreed.  When he arrived, the horses were walking skeletons.  Wolfe denied telling Detective Maldonado that the horses were fat when they arrived.  According to Wolfe, defendant brought six to eight bags of grain and some hay.  Defendant put the grain in a tack room in the barn and the hay in a corn crib.  When defendant came to the property, he would feed the horses.  When defendant became sick, Kloeckner would feed the horses in the morning and Wolfe would do so in the evening.  According to Wolfe, some of the cribbing in the stalls was there when defendant brought the horses.  Wolfe never saw defendant abuse an animal.

¶ 20    On cross-examination, Wolfe testified that at one time defendant had kept horses at her property in Boone County.  When defendant would not feed his horses, she would have to.  She admitted that some of the cribbing in the barn on the Hartman Road property was from defendant's horses.  Wolfe denied ever speaking to Detective Maldonado.  She had an agreement with

defendant in which he was to feed his horses and clean the stalls. She denied that defendant paid her anything for boarding the horses. When defendant had pneumonia, Wolfe and Kloeckner fed his horses. Defendant gave Wolfe $40 to buy hay, but Wolfe just fed his horses her own hay. Defendant was supposed to show up on December 21, 2014, because one of his horses had died, and Wolfe had been asking him for four days to do so. According to Wolfe, defendant's horses had been fed daily.

¶ 21    Wolfe testified on redirect that defendant was in poor health when she saw him a week before December 21. Defendant initially brought grain and hay for his horses, but both ran out. Wolfe denied that the horses were fat when defendant brought them to the Hartman Road property or that she told anyone that they were fat. She testified that, although she had seen the horses six weeks earlier, she did not recognize them when defendant brought them.

¶ 22    Defendant testified that he had been in the horse business for 58 years and was a certified professional rodeo judge. He bought and sold horses for a living. In the fall of 2014, he owned five horses. Because he became ill, he took the horses to Brown's in Peoria. He took two tons of grain and around 170 bales of hay to feed the horses. He dropped off the horses then went to Iowa City to the hospital. According to defendant, the horses were all well-fed and healthy when he dropped them off.

¶ 23    Brown had 40 acres, and defendant trusted him to care for his horses. Several weeks later, Brown called him and said that one of his horses had died. Defendant immediately drove to Peoria, even though he was not healthy enough to drive or care for his horses. When he arrived, the horses were emaciated. One of the horses was a registered sire from which he made money breeding it. Defendant loaded the horses onto his trailer and drove north on I-39.

¶ 24    As he drove, he contacted several friends, including Wolfe, about a place to board the horses. Wolfe agreed to let him bring them to her property.

¶ 25    According to defendant, when he first obtained the black mare, she was in bad shape from a wound in her neck. He took her to a hospital at Bradley University where she was examined, and he obtained medicine for her. He removed a large wood splinter from the wound and treated her himself until he became sick.

¶ 26    Defendant denied knowingly starving any of his horses. When he brought them to Wolfe's, he provided good-quality food. He had planned on filing their teeth the week that they were removed by HAHS. He testified that the horses were at Wolfe's for 10 days before December 21, 2014. Defendant also provided care for the horses' feet. When asked if he knowingly failed to provide veterinary care for the horses, defendant answered that he did not need a vet.

¶ 27    On cross-examination, defendant testified that one mare died at Brown's and the other at Wolfe's. Because he became sick in October of 2014, he took the horses to Brown's. Defendant never contacted a vet about the horses because he believed that he was qualified to care for them. He admitted that the last time that he had filed the horses' teeth was in July of 2014. When asked if he had been at Wolfe's every day, he answered that he did the best he could. He claimed that the horses were properly fed while they were at Wolfe's.

¶ 28    In rebuttal, Detective Maldonado testified that on January 6, 2015, he spoke to Wolfe at the Hartman Road property. She told Detective Maldonado that, when defendant had boarded his horses at her Boone County property, defendant did not properly feed them. Wolfe allowed defendant to keep his horses at her Hartman Road property only because he had begged her. Wolfe told Detective Maldonado that defendant had agreed to pay her $200 and to feed the horses and clean the stalls. Wolfe denied to Detective Maldonado that she or anyone other than defendant fed

the horses. She also said that she seldom saw defendant at the property but that he could have been there nonetheless. At one point, defendant paid her $40 for hay. Wolfe told Detective Maldonado that defendant brought the horses to her property about two months before December 24.

¶ 29    The jury found defendant guilty of five counts of cruel treatment, five counts of violating his duty as owner to provide sufficient food, and two counts of violating his duty as owner to provide veterinary care. The jury found defendant not guilty of three counts of failing to provide veterinary care. The trial court merged all seven of the owner's-duty convictions into the five cruel-treatment convictions and sentenced defendant to 12 months' conditional discharge. Defendant, in turn, filed a timely notice of appeal.

¶ 30                                        II. ANALYSIS

¶ 31    On appeal, defendant raises a sufficiency-of-the-evidence argument as to all 12 of his convictions. However, we have jurisdiction only over the convictions on which the trial court-imposed sentence, namely the cruel-treatment convictions. See *People v. Relerford*, 2017 IL 121094, ¶ 71 (a reviewing court has jurisdiction only over final judgments, and a criminal conviction is not a final judgment until the trial court imposes sentence); *People v. Neely*, 2013 IL App (1st) 120043, ¶¶ 13-15 (no jurisdiction to review merged conviction on which sentence was not imposed). Regarding the cruel-treatment convictions, defendant admits that his horses were malnourished, but contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of knowingly starving the horses.

¶ 32    In evaluating the sufficiency of the evidence, it is not the province of the reviewing court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261. The weight to be given the witnesses' testimony, the determination of their credibility, and the reasonable inferences to be drawn from the evidence are all matters for the trier of fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999). Likewise, the resolution of any conflicts or inconsistencies in the evidence is also within the province of the fact finder. *Collins*, 106 Ill. 2d at 261-62. We will set aside a criminal conviction only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of a defendant's guilt. *Smith*, 185 Ill. 2d at 542.

¶ 33 Section 3.01 of the Humane Care for Animals Act (Act) (510 ILCS 70/3.01 West 2014)) provides, in pertinent part, that no person or owner may starve any animal. Although section 3.01 does not provide a specific mental state, the jury was instructed that it must find that defendant knowingly violated section 3.01. See 720 ILCS 5/4-3(b) (West 2014) (if statute does not prescribe a particular mental state, any mental state defined in section 4-4 (intent), section 4-5 (knowledge), or section 4-6 (recklessness) is applicable).[1] A person acts knowingly if he is consciously aware that his conduct is practically certain to cause injury. 720 ILCS 5/4-5 (West 2014); *People v. Moore*, 358 Ill. App. 3d 683, 688 (2005).

¶ 34 Here, the evidence, when viewed in the light most favorable to the State, was sufficient to prove defendant guilty beyond a reasonable doubt of knowingly starving his horses. The evidence showed that defendant's horses were all in a severe state of malnutrition. According to Dr. Lukas, it would have taken over six months for the most emaciated horse of the four to lose that amount

_____

[1] Neither defendant nor the State suggests that any mental state other than knowledge applied in this case.

of weight and at least a couple of months for the other horses to reach their states of emaciation. According to her, the horses' teeth had been neglected for up to a year, and, because of the condition of their teeth, the horses were not able to obtain all of the nutrition from any food they were given. Significantly, on December 21, 2014, there was neither food nor water accessible to any of the horses. The stalls lacked fresh bedding and were covered in mud and feces, further indicating that defendant was not properly caring for the horses. The only food in the barn, which was not accessible to the horses, was cracked corn. However, according to Huff, cracked corn was not an adequate food for horses. Further, Wolfe told Detective Maldonado that, when defendant had horses at her Boone County property, he neglected to feed them and that she had to do so. She denied to Detective Maldonado that she or anyone other than defendant ever fed the horses. Although Wolfe and defendant testified that Kloeckner helped feed the horses, Kloeckner denied ever having fed defendant's horses. Kloeckner also estimated, inconsistent with defendant's testimony, that the horses had been there for about two months and that he never saw anyone other than defendant tend to the horses. The jury was free to assess the witnesses' credibility and believe Kloeckner over defendant and Wolfe. See *Smith*, 185 Ill. 2d at 542; *Collins*, 106 Ill. 2d at 261-62. Similarly, although defendant denied ever having starved his horses, the jury was in the best position to assess his credibility and reject that testimony.

¶ 35    Although defendant testified that he was seriously ill in the fall of 2014, his illness did not justify his failure to properly care for and feed his horses. If he was unable to do so, as their owner, he was responsible for arranging for someone to do so in his stead. However, as discussed, although he claimed that he arranged to have Kloeckner feed the horses, Kloeckner denied that, and the jury was free to accept Kloeckner's version of events.

¶ 36    Based on the evidence, viewed in the light most favorable to the State, we cannot say that the evidence was so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to defendant's guilt.

¶ 37                                    III. CONCLUSION

¶ 38    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 39    Affirmed.