NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (4th) 210698-U

NO. 4-21-0698

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 12, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| CHRISTOPHER S. LINCOLN, | ) | No. 20CF974 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The appellate court affirmed defendant's conviction for aggravated stalking based on a portion of the stalking statute our supreme court did not strike down as unconstitutional in *People v. Relerford*, 2017 IL 121094. A course of conduct of stalking could be found aside from the unconstitutional provision of the statute.

(2) The appellate court vacated defendant's conviction for a violation of an order of protection under the one-act, one-crime rule because it was based on a violation of the same protection order forming the basis of the aggravated stalking charge.

¶ 2    Defendant, Christopher S. Lincoln, pleaded guilty to aggravated stalking (720 ILCS 5/12-7.4(a)(3) (West 2020)) premised on knowingly engaging in a course of conduct that would cause a reasonable person emotional distress by leaving numerous voice mails for the victim, P.B., in violation of a protection order. See 720 ILCS 5/12-7.3 (a)(2) (West 2020) (the stalking statute). He also pleaded guilty to violation of an order of protection (720 ILCS 5/12-3.4(a)(1) (West 2020)). He appeals contending (1) under *People v. Relerford*, 2017 IL

121094, he pleaded guilty to a facially unconstitutional charge and (2) his convictions of both aggravated stalking and violation of a protection order violate the one-act, one-crime rule.

¶ 3        Although *Relerford* invalidated the portion of the stalking statute criminalizing negligent communications to or about a person, that portion was severable, and we determine defendant's plea was supported under other portions of the statute pertaining to monitoring P.B. and making true threats. Accordingly, we affirm the aggravated stalking conviction. The State concedes the two convictions violate the one-act, one-crime rule. We accept the concession and vacate the conviction for violation of an order of protection.

¶ 4                                I. BACKGROUND

¶ 5        On September 18, 2020, Bloomington police arrested defendant on multiple charges of aggravated stalking of P.B. for leaving numerous voicemails for P.B. and sending emails to her significant other, employer, and father. In particular, count I alleged "on or about" July 15, 2020, through August 27, 2020, defendant committed the offense of aggravated stalking "[i]n that the defendant knowingly engaged in a course of conduct that would cause a reasonable person emotional distress by leaving numerous voicemails for [P.B.] that were in violation of [an order of protection] issued in Cook County on May 12, 2020." Count VI alleged the violation of the same order of protection.

¶ 6        In a complaint for a search warrant, detective Brad Melton stated P.B. and defendant were acquaintances from junior high and high school but never dated. Toward the end of 2013, P.B. began receiving excessive text messages from defendant and asked him to stop contacting her. The record shows defendant was under a delusion P.B. was stalking him. His numerous contacts with P.B. led P.B. to obtain multiple orders of protection and resulted in a

previous conviction of aggravated stalking. In April 2020, defendant texted P.B. on her wedding day when he should not have known she was getting married.

¶ 7    In October 2020, the trial court found defendant unfit to stand trial. A psychiatric evaluation prepared for the fitness hearing detailed reports of the allegations of stalking. Melton reported the history of defendant's contacts with P.B., including text messages he sent on her wedding day, stating he knew she was getting married that day when P.B. reported he should not have known that information. P.B. blocked defendant's number and, on May 12, 2020, obtained a new order of protection.

¶ 8    Melton reviewed voicemail messages P.B. found in a blocked messages folder on her phone, which he described for the psychiatric report. Those messages included allegations P.B. had touched or moved defendant's laundry and a May 9, 2020, message stating "if you want to touch my laundry, you should just touch my d***" and "if you call the FBI, I will f*** you for two hours." When interviewed, defendant told Melton he did not remember making the statements but thought they were funny, or it might have been because of emotional distress because P.B. was stalking him and he was afraid for his life. Defendant also sent emails to P.B.'s place of employment on May 15, 2020, stating an employee was stalking him.

¶ 9    In July 2020, defendant left voice mails stating in part he had contacted and badgered P.B.'s attorney and he wanted the FBI involved because P.B. committed a federal crime. He left a message stating, if P.B. did not go to the FBI, defendant would go to her place of employment, go after her attorney, and go after "all of Cook County," stating "that's not a threat, that's justice. Let's see what you got." Defendant also told P.B. she was "dirty," her attorney should be disbarred, and her attorney's father was now implicated. Defendant stated, "[I]f you

ever come back at me ever again and you don't go to prison, wow, we have some really big f*** problems."

¶ 10 In August 2020, defendant sent an email to P.B.'s husband, making various allegations of stalking and stating P.B. went through his laundry. Defendant further sent emails to P.B.'s attorney, a partner in her law firm, her attorney's father, P.B.'s coworker, P.B.'s father, a coworker of P.B.'s husband, and Melton. Defendant sent at least 15 email messages in just a few days. In those emails, defendant generally repeated his allegations P.B. was stalking him and had touched his laundry. He repeated his desire for the FBI to be involved and made various references to songs, movies, movie characters, and miscellaneous topics that did not make sense.

¶ 11 In March 2021, the trial court found defendant fit to stand trial. At a bond reduction hearing, the State gave a factual basis delineating defendant's history of stalking P.B. The State noted P.B. blocked his number but could see numerous calls and text messages from him in a blocked list. The State noted on the date of her wedding, "he was essentially blowing up her phone." The State also said defendant repeatedly contacted P.B.'s employer, telling the employer P.B. had psychological problems and "they need to do something about it." The State then provided descriptions of multiple voicemails telling P.B. to go to the FBI, stating her attorney should be disbarred, calling her names, and playing a mix of recordings from movies and music. The trial court denied the motion to reduce bond and observed a public safety assessment report concerning defendant included a new violent criminal activity flag.

¶ 12 On June 8, 2021, defendant pleaded guilty to count I of aggravated stalking and count VI of violation of the order of protection. The factual basis for the plea included the following:

- 4 -

"During April 18th through 20th of 2020, [P.B.] was receiving numerous text messages from the defendant. He somehow knew her wedding day was on April 18th of 2020, presumably through finding a wedding gift registry as she does not keep social media, does not post anything on social media. And her friends and family do not post any of her personal information on social media either because of this prior conviction with the defendant and continued and repeated harassing behavior. The victim blocked his number and was granted an emergency order of protection on May 12th of 2020 that was served on the defendant on May 28th of 2020. The preliminary order of protection was granted on July 30th of 2020. The victim sent [a] Bloomington Police Department detective numerous voice mails that were left by the defendant and put into a blocked number folder. The victim indicated to the detective that she did not listen to most of the messages because it was very traumatizing for her to do. Voice mails—the detective did listen to those voice mails, and voice mails that were left included messages like on July 15th of 2020 the defendant mentions being contacted by the victim's employer, Hines VA Hospital, and that the FBI needed to be involved because the victim had committed a federal crime. He told her she had lost and that there is not a no contact order in place. On June 19th of 2020 there were three separate messages where the defendant leaves a message saying that he is the one being stalked and tells the victim to go to the FBI and is asking why the victim is blocking him now if she did not block his messages in 2013. On July 26th of 2020, there were three separate messages claiming that the University of Illinois Champaign-Urbana was protecting the victim and that she needed to turn herself into the FBI and that her

attorney should be disbarred. He also told her that if she comes at him again and does not go to prison that there is a big problem. He called her ['a p***['], ['a***['] and [']stupid as f***.['] On August 15th of 2020 and August 16th of 2020 there were voice mails that were a mix of recordings from movies and songs. Bloomington Police Department reviewed CDR records of the defendant's phone number and determined that the calls of his cell phone were all using cellular towers in Bloomington-Normal. The defendant resides in Bloomington. The defendant has also repeatedly contacted the victim's employer, attorney and husband. Her husband received emails on December 25th of 2019, August 6th, August 8th, August 26th in 2020. He has sent over a dozen emails to her attorney."

The court accepted the plea.

¶ 13        At sentencing, P.B. testified she had been asking defendant to stop contacting her for over seven years. She stated defendant not only contacted her, but he also contacted her coworker, her husband, her husband's coworker, her attorney, her attorney's father, her own father, and her father's business partner. Melton testified about the voicemails, including stating defendant "made some sexual comments to her about that he would have sex with her." Defendant also called her a "p***" and "stupid as f***," further stating "this is a game and I have been playing it out for years." Melton also testified defendant sent emails to third parties attempting to disparage P.B.'s reputation and trying to get her in trouble at her workplace. A series of emails sent by defendant to third parties and repeating allegations against P.B. were also introduced into evidence.

¶ 14　　　　　The trial court sentenced defendant to four years' incarceration on count I and a concurrent term of one year on count VI. In doing so, the court stated defendant caused and threatened serious harm. Defendant moved to reconsider the sentence but did not contend the sentence violated the one-act, one-crime rule. He also never raised issues of the constitutionality of the stalking statute. The court denied the motion to reconsider. This appeal followed.

¶ 15　　　　　　　　　　　　　　　II. ANALYSIS

¶ 16　　　　　　　　　　　A. Defendant's Plea to Aggravated Stalking

¶ 17　　　　　Defendant first contends under *Relerford* he pleaded guilty to a facially unconstitutional statute, making his conviction void. He argues the factual basis for the plea focusing on "numerous voicemails" was insufficient under *Relerford* to establish a criminal course of conduct to support a conviction of stalking.

¶ 18　　　　　The State initially argues defendant forfeited the issue because he did not raise concerns about the constitutionally of the stalking statute to the trial court. However, the unconstitutionality of a statute implicates the trial court's jurisdiction and thus is not waived by a guilty plea. *People v. Price*, 2016 IL 118613, ¶ 31. A facially unconstitutional statute produces a void judgment. *Price*, 2016 IL 118613, ¶ 31. It is well settled a void judgment may be attacked at any time in any court directly or collaterally. *People v. Thompson*, 209 Ill. 2d 19, 25 (2004). Accordingly, the issue is not forfeited. The State also argues defendant failed to present a sufficient record on appeal because he did not include the specific content of the voice mails. But that argument ignores it was not defendant's burden to present evidence to support the factual basis for the plea. Further, there is more specific evidence of the content of the voicemails elsewhere in the record.

¶ 19        Defendant pleaded guilty to aggravated stalking based on conduct in violation of an order of protection issued on May 12, 2020. See 720 ILCS 5/12-7.4(a)(3) (West 2020). To prove a defendant committed the offense of aggravated stalking, the State must first prove the defendant committed the crime of stalking. *People v. Soto*, 277 Ill. App. 3d 433, 438 (1995).

¶ 20        Under section 7.3(a)(2) of the stalking statute, a defendant commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know the course of conduct would cause a reasonable person to suffer emotional distress. 720 ILCS 5/12-7.3(a)(2) (West 2020). The statute defines "course of conduct" as:

> "2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. A course of conduct may include contact via electronic communications." 720 ILCS 5/12-7.3(c)(1) (West 2020).

¶ 21        "Non-consensual contact" is defined as:

> "[A]ny contact with the victim that is initiated or continued without the victim's consent, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; or placing an object on, or delivering an object to, property owned, leased, or occupied by the victim." 720 ILCS 5/12-7.3 (c)(6) (West 2020).

¶ 22        In *Relerford*, the defendant was charged with stalking based on allegations he called the victim, sent her emails, stood outside her place of employment, and entered her place of employment when he knew or should have known his conduct would cause a reasonable person emotional distress. *Relerford*, 2017 IL 121094, ¶ 3. None of the emails contained threatening language. When defendant stood outside of the workplace, he merely waved at the victim. He also did not engage in any threatening behavior when he entered the workplace. *Relerford*, 2017 IL 121094, ¶¶ 9-10. He was further charged with cyberstalking based on Facebook posts expressing a desire to have sexual relations with the victim and her coworkers and threatening them. *Relerford*, 2017 IL 121094, ¶ 3. Those posts were not sent directly to the victim or her coworkers. *Relerford*, 2017 IL 121094, ¶ 11.

¶ 23        Our supreme court held the portions of the cyberstalking and stalking statutes making it criminal to negligently "communicate to or about" a person, where the speaker knows or should know the communication would cause a reasonable person to suffer emotional distress, were facially unconstitutional as overbroad and in violation of the right to free speech under the United States and Illinois Constitutions (U.S. Const., amend. I; Ill. Const. 1970, art. I, § 4). *Relerford*, 2017 IL 121094, ¶¶ 34, 63. However, the court found the unconstitutional portion of the stalking statute severable. *Relerford*, 2017 IL 121094, ¶ 65. Thus, the *Relerford* court did not invalidate the statute as a whole and instead held "the phrase 'communicates to or about' must be stricken from [it]." *Relerford*, 2017 IL 121094, ¶ 65. The court then analyzed whether the defendant's convictions could be sustained based on other conduct prohibited by the statutes under the definition of a "course of conduct," including follows, monitors, observes, surveils, threatens, engages in other non-consensual contact, or interferes with or damages a person's property or pet. 720 ILCS 5/12-7.3(c)(1) (West 2020).

¶ 24　　　The court found none of the emails were threatening. *Relerford*, 2017 IL 121094, ¶ 66. The court also found defendant's conduct of standing outside the victim's workplace did not constitute "nonconsensual contact" because the record did not show the conduct occurred after her employer directed the defendant to stop contacting employees. *Relerford*, 2017 IL 121094, ¶ 67. All that remained was the defendant's uninvited visit to the business after the no-contact directive, but a single instance of contact was insufficient to establish a course of conduct of two or more acts. *Relerford*, 2017 IL 121094, ¶ 68. As to the Facebook posts, the court found they were not directed to the victim or her coworkers and were generally vulgar and intrusive, but not threatening. To the extent there was a threat, there was only one instance, which could not establish a course of conduct. *Relerford*, 2017 IL 121094, ¶ 69. Accordingly, the court vacated the defendant's convictions. *Relerford*, 2017 IL 121094, ¶ 69.

¶ 25　　　Here, defendant pleaded guilty to aggravated stalking based on engaging in a course of conduct that would cause a reasonable person emotional distress by "leaving numerous voicemails" for the victim. Defendant did not challenge the sufficiency of the indictment. The factual basis for the plea focused on voicemails without providing specific content and mentioned defendant discovered the victim's wedding date on a date before the order of protection was issued. Thus, defendant argues the factual basis for his plea was based on the unconstitutional portion of the stalking statute and did not establish the requisite course of conduct encompassed by any of the remaining acts under the course-of-conduct definition.

¶ 26　　　We agree to the extent defendant pleaded guilty to merely leaving "numerous voicemails," his conduct could not be found criminal under *Relerford*. However, under *Relerford*, we also consider whether defendant's conviction can be sustained based on other conduct prohibited by the stalking statue under the definition of a "course of conduct." To that

end, the State argues there is evidence defendant monitored P.B. and threatened her. We analyze the matter under the procedural posture of the case which, unlike in *Relerford*, where the defendant was convicted after a bench trial, here defendant pleaded guilty.

¶ 27    Under Illinois Supreme Court Rule 402(c) (eff. July 1, 2012), a trial court "shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea." "The factual basis for a guilty plea generally consists of either an express admission by the accused that he committed the acts alleged in the indictment or a recital of evidence to the court which supports the allegations in the indictment." *People v. Vinson*, 287 Ill. App. 3d 819, 821 (1997). "Rule 402(c) is satisfied, however, if there is a basis anywhere in the record up to the entry of the final judgment from which the judge could reasonably reach the conclusion that the defendant actually committed the acts with the intent (if any) required to constitute the offense to which he is pleading guilty." *Vinson*, 287 Ill. App. 3d at 821; see also *People v. Carter*, 165 Ill. App. 3d 169, 173 (1988) ("The court may look to any portion of the record to determine the factual basis for the plea.").

¶ 28    The existence of a factual basis relates generally to whether the plea was knowing and voluntary, and to that end the record must be read realistically. *People v. James*, 51 Ill. App. 3d 541, 543 (1977). In accepting a guilty plea, the trial court's duty is only to assure itself a factual basis for the plea exists, not to determine whether the defendant was proved guilty beyond a reasonable doubt. *Carter*, 165 Ill. App. 3d at 172. "A voluntary plea of guilty precludes the necessity for proof." *Carter*, 165 Ill. App. 3d at 173. Thus, in the context of the factual basis for the plea, "reasonable grounds" are all that is required. *People v. Calva*, 256 Ill. App. 3d 865, 872 (1993). "Reasonable grounds" is much less than proof beyond a reasonable doubt or even a preponderance of the evidence. *Calva*, 256 Ill. App. 3d at 872. Indeed, "[t]he trial court can

accept a guilty plea where a factual basis exists, even where the defendant maintains he is innocent." *Calva*, 256 Ill. App. 3d at 872. Thus, here, if the record shows reasonable grounds for the trial court to find two or more acts that defendant, monitored, observed, surveilled, threatened, engaged in other non-consensual contact, or interfered with or damaged a person's property or pet, his guilty plea would not be based solely on the unconstitutional portion of the statute. Relevant to the instant case is evidence of monitoring and threats.

¶ 29    First, the record contains reasonable grounds to find defendant monitored P.B. "The stalking statute does not define 'monitoring,' but the dictionary defines 'monitor' as 'to watch, keep track of, or check usu. for a special purpose.' " *People v. Gauger*, 2018 IL App (2d) 150488, ¶ 19 (quoting Merriam-Webster's Collegiate Dictionary 750 (10th ed. 2001)). For example, the use of fictitious Facebook accounts to contact a victim, downloading pictures of the victim and her family, and obtaining documents from an email account of the victim and other personal information satisfies the definition of monitoring. *Gauger*, 2018 IL App (2d) 150488, ¶¶ 10-12, 19.

¶ 30    Here, materials in the record from the factual basis for the plea, the fitness evaluation, and at sentencing show P.B. kept information about herself private because of defendant's conduct. Yet, defendant discovered her wedding date, most likely from an online registry, and left her numerous text messages on that date. That is evidence of an act of monitoring the victim to learn her wedding date. We acknowledge that act of monitoring occurred before the issuance of the order of protection, which was the basis of the aggravated stalking charge. However, multiple other instances of monitoring occurred after the order of protection was issued and it is irrelevant whether those were earlier or later than the "on or about" dates listed in the indictment, as long as they were not before May 12, 2020. The date

alleged need not be proved precisely where a particular time is not an essential element of the crime and the statute of limitations is not at issue. *People v. Alexander*, 99 Ill. App. 3d 810 (1981). Here, May 12, 2020, is the only essential date, as that is the date the order of protection came into existence to elevate the stalking charge to aggravated stalking.

¶ 31     With the May 12, 2020, date in mind, the record shows in the voicemails left after that date, defendant said he had contacted and badgered the victim's attorney and mentioned her attorney's father. This is circumstantial evidence of monitoring P.B. to discover and contact her attorney. P.B. further said most of the voicemails she received stated the same things as various text messages and emails. Defendant sent emails to the father of P.B.'s attorney, P.B.'s husband, a coworker of P.B.'s husband, and P.B.'s father. In her victim impact statement, P.B. stated defendant had further contacted her coworker and her father's business partner. These acts provide reasonable grounds to find multiple acts of monitoring P.B. to discover her coworkers, family, and her family's business associates and learn how to contact them. This alone supports a finding of two or more acts sufficiently establishing a course of conduct under the stalking statute.

¶ 32     Aside from more than one act of monitoring, the record also contains reasonable grounds to find defendant threatened P.B. We recognize threats under the stalking statue must be "true threats" of unlawful violence such as bodily harm, sexual assault, confinement, and restraint. *People v. Ashley*, 2020 IL 123989, ¶ 47. For a communication of a defendant to be a "true threat," the defendant must "be consciously aware of the threatening nature of his or her speech, and the awareness requirement can be satisfied by a statutory restriction that requires either an intentional or a knowing mental state." *Ashley*, 2020 IL 123989, ¶ 56. Accordingly, "the first amendment exception for a 'true threat' includes situations where the speaker understands

- 13 -

the threatening nature of his or her communication and the import of the words used." *Ashley*, 2020 IL 123989, ¶ 56.

¶ 33     We note some alleged "threats" made by defendant were vague. For example, defendant told P.B. if she did not turn herself into the FBI, defendant would "go after [P.B.'s] attorney" and go after "all of Cook County," saying "that is not a threat, that's just justice." He also said, "[I]f you ever come back at me again and you don't go to prison, wow, we have some really big f*** problems." In the context of a conviction following a trial, without reference to unlawful violence, those "threats" were arguably too vague to be "true threats."  But the record shows more specific references before May 12, 2020, to threats of sexual assault. Melton listened to some of the voicemails at issue and, in those, defendant made sexual references including that "he would have sex with [the victim]." The fitness report contains a reference to a voicemail message in which defendant, who was under a delusion the victim moved his laundry, stated, "[I]f you want to touch my laundry, you should just touch my d***," and "if you call the FBI, I will f*** you for two hours." Defendant also was flagged as having a risk of violence in the fitness evaluation. In the context of a guilty plea, which does not require proof beyond a reasonable doubt, or even by a preponderance of the evidence, when the later "threats" are considered in context with the earlier ones, and when reading the record as a whole, we determine the record provides reasonable grounds to find defendant made "true threats" after May 12, 2020, and understood the threatening nature of the communication and the import of the words used. Thus, there were reasonable grounds to find at least one true threat supporting the factual basis for the plea.

¶ 34     Finally, the record is replete with numerous instances of "non-consensual contact" via text messages to P.B. The statute defines "non-consensual contact" as "any contact with the

victim that is initiated or continued without the victim's consent," and provides a list of examples. See 720 ILCS 5/12-7.3(c)(6) (West 2020). Defendant notes the list of examples all require a physical presence or interaction. However, the statute also recognizes "any contact," and a course of conduct can include "electronic communication," which would include text messages. See 720 ILCS 5/12-7.3(c)(2) (West 2020). In any event, we need not decide whether defendant engaged in "other non-consensual contact" with P.B. as the record shows reasonable grounds to find at least two acts of "monitoring" P.B. and supports at least one "true threat" communicated to P.B. Thus, two or more acts establishing a course of conduct may be found aside from the unconstitutional provision of "communication to, or about a person." Therefore, the record does not show defendant pleaded guilty under a facially unconstitutional statute and we affirm defendant's aggravated stalking conviction.

¶ 35                                      B. One-Act, One-Crime Rule

¶ 36          Defendant next contends his conviction for aggravated stalking in violation of an order of protection and conviction for violating the same order of protection violate the one-act, one-crime rule because violation of the order of protection was a lesser-included offense of aggravated stalking. Defendant acknowledges he forfeited the issue by failing to raise it in the trial court but argues plain error applies and his conviction for violation of an order of protection must be vacated. The State concedes error, and we accept the State's concession.

¶ 37          We agree defendant forfeited this issue by failing to raise it at trial or in his posttrial motion, but we may address it under the plain-error doctrine because it impacts his substantial rights. *People v. Curtis*, 354 Ill. App. 3d 312, 328 (2004).

¶ 38          "A criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *Curtis*, 354 Ill. App. 3d at 328 (citing

*People v. King*, 66 Ill. 2d 551, 566 (1977)). In analyzing the issue, we first ascertain whether the defendant's conduct consisted of a single physical act or separate acts. *Curtis*, 354 Ill. App. 3d at 328. An "act" is "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. "A person can be guilty of two offenses when a common act is part of both offenses." *Curtis*, 354 Ill. App. 3d at 328. If the court determines the defendant committed multiple acts, it then must decide whether any of the other offenses are lesser-included offenses. *Curtis*, 354 Ill. App. 3d at 328. "If any of the offenses are lesser-included, then multiple convictions are improper, but if none of the offenses are lesser-included offenses, then multiple convictions may be entered." *Curtis*, 354 Ill. App. 3d at 328.

¶ 39     Here, we agree the offenses of aggravated stalking and a violation of an order of protection involve multiple acts. We also agree with the parties' lesser-included-offense analysis.

¶ 40     "We use the charging-instrument approach in identifying lesser-included offenses." *Curtis*, 354 Ill. App. 3d at 329. "To qualify as a lesser-included offense under this approach, the instrument charging the greater offense must, at a minimum, set out the main outline of the lesser offense." *Curtis*, 354 Ill. App. 3d at 329. The indictments here charged defendant with committing aggravated stalking in violation of an order of protection. The sole count of a violation of an order of protection charged defendant with violating the same order of protection. The violation of the order of protection conviction was inherent in the offense of aggravated stalking and was the sole factor increasing the stalking charge to aggravated stalking. Defendant could not have been convicted of aggravated stalking unless he was first convicted of a violation of an order of protection. See *Curtis*, 354 Ill. App. 3d at 329. Thus, "because the indictment charging the greater offense sets out the main outline of the lesser offense in that it requires proof that defendant violated an order of protection, the lesser offense cannot stand."

- 16 -

*Curtis*, 354 Ill. App. 3d at 329. Accordingly, we accept the State's concession and vacate defendant's conviction and sentence for violation of an order of protection. See *Curtis*, 354 Ill. App. 3d at 329.

¶ 41                           III. CONCLUSION

¶ 42        For the reasons stated, we affirm defendant's conviction for aggravated stalking but vacate his conviction for violation of an order of protection.

¶ 43        Affirmed in part and vacated in part.