NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (5th) 241024-U

NOS. 5-24-1024, 5-24-1025 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FIFTH DISTRICT

FILED
July 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| ADAM SMITH, | ) | Nos.  20CM288 |
| Defendant-Appellant. | ) | 21CF1538 |
| | ) | |
| | ) | Honorable |
| | ) | Jeremy J. Richey, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Harris and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed defendant's conviction for aggravated stalking where he engaged in a threatening course of conduct by repeatedly sending letters to the victim describing the sexual acts he wanted to perform on her. The court also affirmed defendant's convictions for violation of a stalking no contact order where the State presented sufficient evidence defendant knowingly violated a valid no contact order.

¶ 2    Following a bench trial, defendant, Adam Smith, was convicted in Macon County case No. 21-CF-1538 of aggravated stalking (720 ILCS 5/12-7.4(a)(3) (West 2020)) and in Macon County case No. 20-CM-288 of four counts of unlawful violation of a stalking no contact order (740 ILCS 21/125 (West 2020), 720 ILCS 5/12-3.9(a)(1)(A) (West 2020)). Defendant was sentenced to eight years' imprisonment for aggravated stalking and fined $25 for each count of violation of a stalking no contact order. Defendant appeals, arguing his conviction for aggravated stalking is void because the portion of the statute that was the basis for the offense is facially

unconstitutional under *People v. Relerford*, 2017 IL 121094. He further argues the State failed to prove him guilty of violating a stalking no contact order because there was insufficient evidence he knowingly violated a valid no contact order. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4        The State charged defendant with the above-referenced offenses after defendant continuously sent notes and letters to his former attorney, Monica Hawkins, at various times in 2020 and 2021, despite her having obtained an order of protection against him. After the trial court consolidated the cases, a bench trial commenced on January 18, 2024. The following evidence was adduced.

¶ 5        Hawkins was a licensed attorney, and in 2010, was appointed to serve as an assistant public defender for defendant in a prior case. Hawkins's representation of defendant lasted until approximately 2012. During that time, defendant sent Hawkins handwritten letters, and he continued to do so from the Illinois Department of Corrections (DOC) for several years after he ceased being her client. The State introduced into evidence several such letters, which Hawkins described as becoming "progressively worse and worse and worse" in that they began discussing "stuff he wants to do and sexual stuff that he wants to do to me." For example, in a letter dated February 1, 2019, defendant expressed his "unconditional love" for Hawkins and noted, *inter alia*, how "wonderful" it would be to "turn[ ] you on" until she was so "eager that your p*** is dripping with anticipation of swallowing my big rock hard c***," and "I want to c*** in your p*** so bad (I need p*** so bad)." Hawkins testified the letters "just kept getting really bad" and made her feel "[u]ncomfortable, disgusting, scared, [and] unvalued." Additionally, she was concerned because she believed defendant knew where she lived, as he had called her house, and her address was in the phone book. Hawkins noted she took several steps to protect herself, including contacting

Internal Affairs at DOC on several occasions, speaking to the Macon County sheriff, getting a German Shepherd, obtaining a concealed carry license, placing cameras on her house, and disconnecting her phones.

¶ 6        Hawkins testified she obtained an emergency order of protection on April 15, 2020, effective until May 5, 2020, which, *inter alia*, prohibited defendant from contacting her directly or indirectly via notes or mail. Todd Choatie, a patrol officer with the Macon County Sheriff's Office, testified he served upon defendant the emergency stalking no contact order on April 15, 2020. Despite this, Hawkins continued to receive communications from defendant. The State introduced a handwritten letter postmarked April 27, 2020, that included an expression of love and a request for forgiveness. Hawkins testified she recognized the handwriting as defendant's.

¶ 7        Due to COVID-19 protocols in effect at the time, a plenary hearing on Hawkins's request for an order of protection did not occur until June 16, 2020. Defendant appeared *pro se*. Hawkins testified his letters were initially "fine" but "got more vulgar and too personal" over the years. She further testified "they made [her] feel very uncomfortable and scared and worried" because she "worried that if he got out, that he may do something sexual." Defendant then cross-examined Hawkins and told her he was sorry. Following the hearing, Judge Rodney Forbes issued a plenary order of protection, effective until June 16, 2022, which prohibited defendant from contacting Hawkins through written notes or mail.

¶ 8        The State introduced a letter, postmarked June 18, 2020, defendant wrote to the prosecutor who was previously assigned to the case. In the letter, defendant wrote he was "ashamed" because he realized the order of protection was "completely warranted and justified." Defendant wrote, "I completely understand why she had fear that I might attempt to rape her," and "I completely understand her fears of me now and why."

¶ 9　　　　　On July 30, 2020, defendant filed a *pro se* motion to reconsider, challenging the order of protection. Defendant claimed Judge Forbes was "100% disqualified" from issuing it. The motion was denied, and defendant did not appeal.

¶ 10　　　　　Although the order of protection was in effect, Hawkins continued to receive communications. The State introduced several notes and letters into evidence, which purported to be from such senders as "Lindsey Shelton," "James Holt," "Douglas Simmons," "Robert Harrington," and "Anthony Butler." Hawkins testified she knew none of these individuals except Shelton and she recognized the handwriting in each letter as defendant's or an attempt by defendant to mask his handwriting.

¶ 11　　　　　Many of the letters contained defendant's expressions of love toward Hawkins. For example, in a letter postmarked November 12, 2020, defendant stated he loved Hawkins and wanted to marry her and "do all those sexy things that I wrote to you about." A letter postmarked January 4, 2021, stated defendant hoped "love will conquare [*sic*] any peer pressure that comes against you to reject me/persecute me for it" and wanted Hawkins to "come to your senses and open your eyes befor its to late [*sic*]." That letter also noted, "I know you felt something for me" because during one visit "as my attorney," Hawkins had her "hair up real pretty" and was "excited" to show she was not wearing a ring. Moreover, defendant stated, "If you want to prosecute me for writing this letter to you then go ahead. But if you do I know its because of pear [*sic*] pressure and I won't be angry with you." In another letter, defendant requested that Hawkins "open your eyes to see taste and feel my love for you" because she was who "the Lord promised me so long ago in my dreams." In a June 2021 letter, defendant stated he wanted "to kiss you and hold you so bad" and further asserted, "Please forgive me if I ever offended you in any way. All I ever wanted was to win your heart so that I could be with you to express my love in ways that would set us free."

¶ 12    Additionally, several letters contained explicit language describing sexual acts defendant wanted to perform on Hawkins. For example, in a letter postmarked January 20, 2021, defendant told Hawkins he "needs p*** realy [*sic*] bad," wanted "to have my c*** inside you," and wanted "to feel it sliding in and out of your p*** til I c*** inside you."

¶ 13    Another letter, postmarked July 29, 2021, contained the following language:

"Please read this letter with an open minde and an open heart ***. *** The only thing Im sorry for is you have taken certain letters the wrong way by getting upset when they were intended for your enjoyment. ***

*** I have fantasized about you for 10 full years now nonstop. ***

Imediatly after my release I will be in dire desperate need of finding & getting p*** because Iv been deprived for so long. When I get out will you please finde me & take me home with you and give me what I need? Because when I finaly get some p*** I want to forplay and make love. I want to kiss & suck on a woman I love & become intimatly one with her. Your the only one I can do that with because with anyone else its just sex (getting some p***). ***

Just imagine how good its going to feel finaly getting all you need to be fully satisfied. Just imagine the intense stimulation and sensations of caressing kissing & sucking—getting your p*** sucked so good it makes you c***. Feeling my lips sucking on your p*** lips with my tongue sticking inside French kissing while your c***. Your p*** dripping at the climax of anticipation on finaly recieving my long awaited rock hard throbing c*** into your p*** like a jack hammer-hammering that orgasmic spot inside you over & over & over nonstop until you squirt. I want so bad to feel the sensation of my rock hard c*** c*** inside

your p***, don't you want to feel it to?

***

Please dont be upset with me for anything I ever said in which you took the wrong way. I cant ever expect my fantacys of you & me to cum true, if I don't ever tell you what they are can I? [*sic*]"

Defendant included with that letter a "birthday card" containing words and letters cut out of magazines and newspapers and arranged to read, *inter alia*, "Release the Nature and the intensity of our desire," "Adam loves Monica," and "Happy 50th birthday Monica I love you with all my heart." In crayon, defendant wrote, "I want to kiss and suck you so good that you will always cum [*sic*] to me for more."

¶ 14 In yet another letter to Hawkins, postmarked August 18, 2021, defendant stated, "Please forgive me for asking," but "Please let me c*** in your p***." Defendant also asked Hawkins, "Please don't be upset or uncomfortable."

¶ 15 Hawkins testified receiving letters such as these made her feel "sickened," "scared," and "worried." A letter from defendant postmarked August 24, 2021, provided, "Im [sic] truly sorry for being so degrading in my last letter. Please forgive me for not respecting with the utmost proper modest respect that you so deserved. It wont [*sic*] happen again." Even so, Hawkins testified to additional letters defendant subsequently sent her, including those containing similar explicit sexual language. In a letter postmarked September 10, 2021, defendant asked Hawkins to marry him and stated he wanted to "do all those things together with you that I been talking to you about & fantasizing about."

¶ 16 On September 20, 2021, defendant sent another letter containing a poem expressing, over two pages, his desire to, *inter alia*, "get[ ] your p*** wet with c***," "suck[ ]

- 6 -

your p*** lips untill my throbing hard on profusly drips [*sic*]," and "c*** in my queen." Defendant also asked Hawkins whether she had a vibrator and described wanting to use one to "teas[e] your p*** so good *** before I stick my big rock hard c*** inside your p***." Hawkins testified this letter made her feel "Scared. Disgusted. Demeaned. Horrible." In a later letter, defendant again expressed his love to Hawkins and stated, "Please forgive me in my last letter with that love poem (that 'I hope' you liked and enjoyed). Please forgive me for asking if you had a vibrater [*sic*]."

¶ 17    On September 27, 2021, defendant wrote to Hawkins that if he "ever did say or write anything to you that ever upset you or made you feel uncomfortable in any way I'm truly sorry with all my heart because that wasn't my intentions & I hope you can & will forgive me with love & forgiveness in your heart." Defendant also stated he loved Hawkins, had "dreams of getting out somehow," and wanted to "spend some time together" with her. Hawkins testified this letter made her feel like she did upon receiving the previous ones and made her fear "[t]hat if he got out he would come for me" to "[a]ttack me, rape me, do something bad." Hawkins indicated she feared physical harm from defendant. She testified, "Having someone say they want to stick their rock-hard c*** in your p*** is really saying, yes, that is going to cause me harm," and she "[a]bsolutely" interpreted defendant's statements as being violent and threatening toward her.

¶ 18    Hawkins stated she never indicated to defendant she wanted to receive his letters, and when she received one, her "heart would drop." Even so, she opened several of them to ensure they did not mention her children because she feared they would. The letters also made her "worried for when he's getting out, especially when he gets out."

¶ 19    Defendant's testimony reflected his assertion he did not intend to make Hawkins afraid of him. He stated he never intended to physically harm Hawkins, scare her, or force himself on her sexually, and he did not believe his letters were threatening. Instead, his intention was "[t]o

win her heart and to I guess seduce her sexually," as well as "to get in a relationship with her." Defendant claimed if he scared Hawkins, "that would defeat the entire purpose of me writing those letters to try to win her heart." Defendant testified he did not believe his letters scared Hawkins because, although he sent "hundreds of letters" to her, "she never made any complaints to me," and to the extent she claimed she was afraid, he believed she was being pressured to say so. Defendant acknowledged he sent apology letters "just in case I was wrong" and "in case *** she was afraid" because "I did not intend to do anything against her will." Defendant also admitted he used names and return addresses other than his "to get around" DOC preventing his letters from being sent to Hawkins.

¶ 20 As to the order of protection, defendant testified he believed Judge Forbes lacked the authority to enter it and asserted it was void. His belief stemmed from the prior recusal of all Macon County judges in previous cases involving defendant, which was apparently done to avoid any possible conflicts of interest stemming from prior threats defendant was alleged to have made against a Macon County judge. As support, defendant introduced a portion of a transcript from another case involving defendant, Macon County case No. 18-CF-1526, in which Judge A.G. Webber stated, "[S]ince 2015[,] all Judges in Macon County had recused themselves from any of [defendant]'s cases. And so, any of his cases, anything to do with them, were being handled by Judges from outside of Macon County." Similarly, defendant testified, every case involving him since 2015 had been "assigned to an out-of-county judge," and therefore,

> "I automatically knew by experience that every judge was required to recuse
> himself, and then it was required by the blanket rule that every judge—I've had at
> least over 15 cases, probably 20-some cases, both civil and criminal, and each and
> every case it was always every single one assigned to an out-of-county judge.

Specifically under Rule 63(c)" (now codified as Illinois Code of Judicial Conduct, Canon 2.11(A) (eff. Jan. 1, 2023), which notes a judge "shall disqualify himself or herself in any proceeding in which the judge's impartiality[ ] might reasonably be questioned").

Defendant acknowledged, despite his belief the order of protection was void, he filed a motion to reconsider the entry of the order, which was denied. Defendant testified he did not appeal the denial of his motion to reconsider "because the thing was already void" and he "didn't have to get a higher court's opinion."

¶ 21        The trial court found defendant guilty of aggravated stalking in case No. 21-CF-1538 and all four counts of unlawful violation of a stalking no contact order in case No. 20-CM-288. The court sentenced defendant to eight years' imprisonment for aggravated stalking and fined him $25 for each count of violation of a stalking no contact order.

¶ 22        This consolidated appeal followed.

¶ 23                                II. ANALYSIS

¶ 24         A. Whether Defendant's Aggravated Stalking Conviction Is Void

¶ 25        Defendant argues his aggravated stalking conviction is void because the prohibition against conduct that "communicates to or about" a person in section 12-7.3(a)(1) of the Code (the stalking statute) (720 ILCS 5/12-7.3(a)(1) (West 2020)), which served as the basis for his aggravated stalking conviction under section 12-7.4(a)(3) of the Code (720 ILCS 5/12-7.4(a)(3) (West 2020)), was deemed unconstitutional in *Relerford*, 2017 IL 121094, ¶ 63. The State responds, although that provision was deemed unconstitutional, defendant's conviction can be sustained on the alternate basis that he knowingly engaged in a threatening course of conduct against Hawkins.

¶ 26    When a judgment is based on a statute that is facially unconstitutional, it is void *ab initio*. *People v. Price*, 2016 IL 118613, ¶ 31. Issues pertaining to the constitutionality of a statute are reviewed *de novo*. *People v. Villareal*, 2023 IL 127318, ¶ 14.

¶ 27    Defendant was convicted of aggravated stalking based upon conduct in violation of an order of protection. See 720 ILCS 5/12-7.4(a)(3) (West 2020). To prove a defendant committed aggravated stalking, the State must first prove the defendant committed the offense of stalking. *People v. Soto*, 277 Ill. App. 3d 433, 438 (1995). Under section 12-7.3(a)(1) of the Code (the stalking statute) (720 ILCS 5/12-7.3(a)(1) (West 2020)), a person commits stalking when he or she, *inter alia*, "knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to *** fear for his or her safety or the safety of a third person." The stalking statute defines "course of conduct" in section 12-7.3(c)(1) of the Code (§ 12-7.3(c)(1)) as:

> "2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. A course of conduct may include contact via electronic communications."

¶ 28    Our supreme court has held the "communicates to or about" provision of the stalking statute is unconstitutional. *Relerford*, 2017 IL 121094, ¶¶ 34, 63. In *Relerford*, after the defendant was informed he was not offered a position at the victim's place of employment, he called the victim, sent her multiple e-mails inquiring whether he could work as an intern, entered the victim's place of employment, and waved at the victim through a window while she was

leaving work. *Id.* ¶¶ 4-9. The defendant's e-mails did not contain threatening language. *Id.* ¶ 5. The defendant also made several Facebook posts referencing the victim and her employer. *Id.* ¶ 11. In one post, the defendant stated, " '[I]f [the victim]'s vagina is not in my mouth by next Friday, bury the entire Michigan State football team from 1993.' " *Id.* In another post, the defendant stated he wanted to " 'f*** [the victim].' " *Id.* Another post ordered the victim's employer to give him a job, and if " 'my s*** gets shut down by any and everyone who does, dies.' " *Id.* The defendant did not send any of the Facebook posts directly to the victim. *Id.* The State charged the defendant with stalking based on his phone calls and e-mails to the victim, standing outside of her workplace, and entering her place of employment. *Id.* ¶ 3. The State alleged the defendant knew or should have known his course of conduct would cause a reasonable person to fear for her safety. *Id.* The State also charged him with cyberstalking for using Facebook posts to express his desire to engage in sexual relations with the victim and threatening her coworkers while knowing his conduct would cause a reasonable person to fear for her safety. *Id.*; see 720 ILCS 5/12-7.5(a) (West 2012).

¶ 29        Our supreme court held the parts of the stalking and cyberstalking statutes criminalizing negligently "communicat[ing] to or about" a person where the speaker knows or should know the communication would cause a reasonable person to suffer emotional distress were facially unconstitutional as overbroad and violated the right to free speech under the United States and Illinois Constitutions (U.S. Const., amend. I; Ill. Const. 1970, art. I, § 4). *Relerford*, 2017 IL 121094, ¶¶ 34, 63. Even so, the court determined the offending part of the stalking statute was severable and held "the phrase 'communicates to or about' must be stricken from [it]." *Id.* ¶ 65. Thereafter, the court considered whether the defendant's convictions could be sustained based on other prohibited conduct under the definition of "course of conduct." *Id.* The court concluded the defendant's conduct was not prohibited and vacated his convictions. *Id.* ¶¶ 65-69. The court

- 11 -

reasoned (1) there was no evidence his calls and e-mails were threatening; (2) because there was no evidence establishing the date the defendant waved at the victim at her place of employment, the State failed to establish it happened after the victim had obtained a no contact order, and therefore, it failed to show the act was nonconsensual; (3) the defendant's visit to the victim's employer was only a single instance of nonconsensual conduct and, therefore, could not constitute a "course of conduct"; and (4) while the defendant's Facebook posts were vulgar in referencing the victim and threatening the victim's coworkers, they contained no specific threats directed at the victim. *Id.* ¶¶ 66-69.

¶ 30    Here, defendant argues, and the State concedes, the State proceeded at trial under the "communicates to or about" section of the stalking statute to prove defendant engaged in a course of conduct. As that portion of the stalking statute has been deemed facially unconstitutional in *Relerford*, we agree defendant's conduct is not criminal under that specific provision. However, *Relerford* instructs us to consider whether defendant's conviction can be sustained pursuant to other prohibited conduct in the stalking statute. Anticipating this step of the analysis, defendant argues, relying on *Relerford*, his conviction for aggravated stalking must be vacated because "[his]letters were not physically threatening, just vulgar." He further contends he "did not threaten to rape Hawkins" but "meant only to 'win her heart or seduce her.' " The State counters defendant's conduct established he knowingly engaged in a threatening course of conduct against Hawkins such that his conviction can be sustained.

¶ 31    Our supreme court has held the term "threatens" in section 12-7.3(c)(1) "refers to 'true threats' of unlawful violence such as bodily harm, sexual assault, confinement, and restraint" that the speaker knows would cause a reasonable person to fear for his or her safety. *People v. Ashley*, 2020 IL 123989, ¶ 47. "True threats" are " 'those statements where the speaker means to

communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' " *Id.* ¶ 33 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). While a speaker need not have the "specific intent to threaten the victim," (*id.* ¶ 58) the speaker "must be subjectively aware of the threatening nature of the speech." *Id.* ¶ 56. In other words, a true threat "includes situations where the speaker understands the threatening nature of his or her communication and the import of the words used." *Id.* As part of the assessment of whether speech constitutes a true threat, a court must "consider the effect on the listener." *Id.* ¶ 67.

¶ 32    We conclude defendant's conviction can be sustained under the "threatens" portion of section 12-7.3(c)(1). Initially, we note defendant's reliance upon *Relerford* to argue his letters were, like the Facebook posts in that case, merely vulgar and not threatening is misplaced. Here, unlike *Relerford*, defendant wrote hundreds of explicit letters over several years describing in great detail the sexual acts he wanted to perform on Hawkins, and he sent those letters directly to her. Hawkins testified the numerous letters she received from defendant made her feel worried, scared, and afraid that he would attack or rape her. This conduct is a far cry from the acts defendant points to in *Relerford*, which amounted to the defendant created only two Facebook posts, one containing vulgar statements about the victim that were not sent to her and another that did not directly threaten the victim. *Relerford*, 2017 IL 121094, ¶ 11.

¶ 33    Beyond the fact that the conduct in *Relerford* is readily distinguishable, defendant's argument he meant only to win Hawkins's heart with his letters is unavailing. The evidence established defendant was subjectively aware of the threatening nature of his speech toward Hawkins. Defendant was present at the plenary hearing for Hawkins's request for an order of protection on June 16, 2020. At that hearing, Hawkins explicitly testified she was "very uncomfortable and scared and worried" about the letters defendant had sent her for several years,

with many containing explicit descriptions of sexual acts he wanted to perform on her. Following that hearing, defendant acknowledged in a June 18, 2020, letter to the prosecutor previously assigned to the case, "I completely understand why she had fear that I might attempt to rape her." Despite hearing Hawkins's testimony and admitting he understood Hawkins feared him because of his letters, defendant continued to send explicit letters to Hawkins through the remainder of 2020 and in 2021. These letters included the same type of sexual language defendant acknowledged supported Hawkins's belief he might rape her. Hawkins testified she continued to feel scared, worried, and horrible upon receiving these letters, as she believed defendant was expressing he was "going to cause me harm."

¶ 34        Moreover, nothing in the evidence suggests defendant was somehow disabused of his admitted understanding Hawkins feared he might rape her as a result of his letters. Indeed, defendant's own writings indicate he knew Hawkins felt threatened by his letters, but he nevertheless continued to send them to her. For example, after the plenary order of protection was entered against him, defendant told Hawkins in his July 29, 2021, letter to "read this letter with an open minde [*sic*]" and apologized for upsetting her, only to then state he wanted to put his "c*** into your p*** like a jack hammer-hammering that orgasmic spot." Similarly, defendant's September 10, 2021, letter recognized being "degrading" toward Hawkins in a prior letter, yet on September 20, 2021, he sent her a poem describing over two pages the sexual acts he wanted to perform on her. Finally, to the extent defendant argues the State failed to show a reasonable person would have been in fear of her safety because (1) defendant was incarcerated at all relevant times and, therefore, "could not have raped her" and (2) the apparent lapse of the plenary order of protection in June 2022 suggested Hawkins did not fear for her safety, we reject this argument. Defendant presents no authority for the proposition that a victim's fear of harm is less reasonable

where the individual threatening her is incarcerated. Indeed, several of defendant's letters mentioned he had "dreams of getting out somehow" and wanted to perform sex acts on Hawkins "[w]hen I get out." Hawkins testified not only that the letters themselves made her feel scared, but also that she feared defendant could "get[ ] out" and rape her, causing her to be "worried for when he's getting out, especially when he gets out." Given this, and in light of the significant number of threatening and sexually explicit letters defendant sent Hawkins, the trial court could determine defendant's actions would have caused a reasonable person to fear for his or her safety despite defendant's incarceration. See *People v. Holt*, 271 Ill. App. 3d 1016, 1023-24 (1995) (rejecting the defendant's argument his stalking victim could not have feared him where she continued to go to an ice rink after seeing the defendant there, as the trial court could reasonably conclude the defendant's actions would cause apprehension in a reasonable person based on evidence the defendant called her 5 to 10 times per day, sent postcards to her indicating, *inter alia*, ignoring him would not make him leave her alone, and told the victim multiple times she would have to deal with him for the rest of her life).

¶ 35 Given the foregoing, we conclude the evidence established defendant engaged in a threatening course of conduct toward Hawkins. Even accepting, *arguendo*, defendant's claim he did not specifically intend to threaten Hawkins, the evidence showed she was fearful as a result of receiving his letters and defendant was aware his letters upset her. Despite understanding the threatening nature of his communications, he continued to send Hawkins similar letters throughout 2020 and 2021, after an order of protection had been entered against him. Accordingly, we conclude, while defendant's conviction for aggravated stalking cannot rest upon the "communicates to or about" provision of the stalking statute, it can be sustained under the "threatens" provision. Thus, we reject defendant's claim his aggravated stalking conviction is void.

¶ 36                          B. Sufficiency of the Evidence

¶ 37        Defendant argues his convictions for violating a stalking no contact order were not supported by sufficient evidence because the State failed to prove he knowingly violated a valid stalking no contact order.

¶ 38        When a defendant challenges the sufficiency of the evidence underlying a conviction, a reviewing court must determine whether, while viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the offense beyond a reasonable doubt. *People v. Galarza*, 2023 IL 127678, ¶ 25. It is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Thus, in a bench trial, it is the trial court's responsibility to determine the credibility of witnesses, the weight to be given to the testimony, and to resolve inconsistencies therein. *Id.* In doing so, a trier of fact need not disregard inferences that flow normally from the evidence or search out all potential explanations consistent with innocence. *Id.* This court will not substitute its judgment for that of the fact finder on questions relating to the weight of the evidence or the credibility of witnesses, and we will draw all reasonable inference in favor of a finding of guilt. *Id.* ¶ 26. We will reverse a defendant's conviction only where the evidence is " 'so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt.' " *Id.* (quoting *People v. Belknap*, 2014 IL 117094, ¶ 67).

¶ 39        A person commits the offense of violation of a stalking no contact order where he or she "knowingly commits an act which was prohibited by a court *** in violation of *** a remedy in a valid stalking no contact order of protection" and the violation occurs after the offender had been served notice of the contents of the order. 720 ILCS 5/12-3.9(a) (West 2020).

¶ 40　　　　The parties do not dispute defendant was served notice of the contents of the order of protection against him. Instead, defendant claims insufficient evidence was presented to show he knowingly violated a valid stalking no contact order. Specifically, he contends he reasonably believed Judge Forbes lacked the authority to issue it and, as such, it was void. In arguing this was a reasonable belief, defendant cites the transcript from case No. 18-CF-1526, wherein Judge Webber stated, "[S]ince 2015, all Judges in Macon County had recused themselves from any of [defendant]'s cases. And so any of his cases *** were being handled by Judges from outside of Macon County." Defendant further points to his testimony in which he explained Judge Webber's sentiment was consistent with his experience that all his cases since 2015 had been "assigned to an out-of-county judge." Thus, he "automatically knew by experience that every judge was required to recuse himself" from his cases. The State counters defendant's claim he did not believe the trial court had the authority to issue the order of protection is undercut by the facts that he appeared for the hearing on the plenary order of protection, filed a motion to reconsider the order after the court entered it, and declined to appeal the order. The State contends these facts show defendant did recognize the court's authority and the validity of the order of protection.

¶ 41　　　　"[A] person acts knowingly when he is consciously aware that the circumstances described by the statute defining the offense exist." *People v. Leib*, 2022 IL 126645, ¶ 37; see 720 ILCS 5/4-5 (West 2020). Further, "knowledge of a material fact includes awareness of the substantial probability that the fact exists." *Leib*, 2022 IL 126645, ¶ 37. Often, knowledge is proven by circumstantial evidence because, as the mental element of an offense, it is rarely proven by direct evidence. *Id.*

¶ 42　　　　Initially, we note the record refutes defendant's claim he believed the trial court lacked the authority to issue the order of protection. Despite his assertion, the record unequivocally

shows he recognized the court's authority by appearing before Judge Forbes at the hearing on the plenary order of protection on June 16, 2020, and cross-examining Hawkins. Moreover, defendant admitted after the court issued the order of protection, he filed a motion to reconsider to challenge it. He further admitted once his motion to reconsider was denied, he opted not to appeal. Contrary to defendant's argument, these acts show defendant understood the court had the authority to enter an order of protection against him and, as a result, litigated the matter to prevent the entry of such a valid order.

¶ 43        We further note defendant has failed to show any legal basis justifying his belief Judge Forbes lacked the authority to issue the order of protection or that the order was invalid. He rests his belief upon Judge Webber's statement in case No. 18-CF-1526 that "since 2015, all Judges in Macon County had recused themselves from any of [defendant]'s cases." From there, defendant appears to contend some form of a standing order or practice existed in Macon County that prohibited Macon County judges from presiding over defendant's cases due to a conflict. Defendant, however, points to nothing in the record to substantiate his belief, and our review of the record reveals no formal order finding a conflict existed between Macon County judges and defendant that required all Macon County judges to recuse themselves from defendant's cases.

¶ 44        Finally, even assuming, *arguendo*, defendant reasonably believed Judge Forbes lacked the authority to enter the order of protection, that belief would not correspond with a failure by the State to establish knowledge for purposes of the offense of violation of a stalking no contact order. At best, defendant's belief would amount to a mistaken understanding of the law. However, in the context of a criminal offense, "[k]nowledge generally refers to an awareness of the existence of the facts which make an individual's conduct unlawful [citation], not to knowledge of the law." (Internal quotation marks omitted) *People v. Witherspoon*, 2019 IL 123092, ¶ 33 (rejecting the

defendant's argument the State failed to prove the knowledge element of home invasion because, while it was true that the meaning of "without authority" was not settled at the time of the offense, the State had to prove the defendant had knowledge of a court order prohibiting him from entering the victim's home, not that he understood the law). It is a deeply embedded principle of our system of jurisprudence that "one's ignorance of the law does not excuse unlawful conduct." *People v. Izzo*, 195 Ill. 2d 109, 115 (2001).

¶ 45 Thus, when viewing the evidence in the light most favorable to the State, as we must, we conclude the evidence was sufficient to establish defendant knowingly violated a valid stalking no contact order. The evidence showed defendant appeared *pro se* at the June 16, 2020, hearing on the plenary order of protection and litigated the matter. After the trial court issued the order of protection against him, he acknowledged in a letter postmarked June 18, 2020, the order of protection was "completely warranted and justified." Even so, defendant challenged the order in a motion to reconsider that was denied, and he did not appeal that ruling, leaving the order in place. Despite this, defendant continued to send threatening letters to Hawkins through 2021, describing sexual acts he wanted to perform on her and going so far as to use names and return addresses other than his "to get around" DOC preventing his letters from being sent to Hawkins. Given this evidence, we conclude defendant knew an order of protection had been entered against him yet proceeded to send Hawkins threatening letters such that he knowingly violated a valid stalking no contact order. Accordingly, the evidence was sufficient to convict defendant on each count of violating a stalking no contact order.

¶ 46 III. CONCLUSION

¶ 47 For the reasons stated, we affirm the trial court's judgment.

¶ 48 Affirmed.